M. Taboada & Co. y A. Fernández Hno. & Co., demandantes y apelantes, *v.* Prudencio Rivera Martínez, en su carácter de Comisionado del Trabajo, demandado y apelado.

Núm. 7311.—*Sometido:* Enero 13, 1937. *Resuelto:* Abril 13, 1937.

*Leopoldo Feliú*, abogado de los apelantes; *Hon. Procurador General B. Fernández García, Luis Janer, Subprocurador y Pedro Santana, abogado del Departamento del Trabajo,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

El Centro de Detallistas de Provisiones de Puerto Rico, una asociación organizada de acuerdo con la ley de corporaciones sin fines pecuniarios, y M. Taboada y Compañía y Fernández Hermano y Compañía, dos sociedades mercantiles constituídas con arreglo al Código de Comercio, acogiéndose a los preceptos de la ley núm. 47 relativa a sentencias y decretos declaratorios de 1931 (pág. 379) pidieron a la Corte de Distrito de San Juan que declarara nula por anticonstitucional la Ley núm. 49 de 1935 ((2) pág. 539), decretada para regular las horas de trabajo de personas empleadas en los establecimientos comerciales, industriales y en otros negocios lucrativos, y para otros fines.

La parte demandada que lo fué el Comisionado del Trabajo Prudencio Rivera Martínez, excepcionó la demanda por indebida acumulación de partes demandantes, porque el Centro de Detallistas no tenía capacidad para demandar, por defecto de partes demandadas y por falta de hechos suficientes para determinar una causa de acción.

La Corte de Distrito resolvió dichas excepciones—exponiendo por medio de su Juez Sr. de Jesús amplia y cuidadosamente las razones que a ello la llevaron—declarando con lugar la de indebida acumulación de partes demandantes, la de incapacidad legal para demandar del Centro de Detallistas y la de falta de causa de acción y sin lugar la de defecto de partes demandadas.

Nada más gestionó el Centro de Detallistas. Las mercantiles demandantes archivaron una demanda enmendada. Reprodujo contra ella el demandado su excepción de falta de hechos y la corte estimando que la demanda enmendada y la original eran substancialmente iguales en cuanto a los motivos alegados para pedir la anticonstitucionalidad de la ley, por los fundamentos que había expuesto anteriormente declaró la excepción con lugar y dictó sentencia desestimándola, sin especial condenación de costas.

No conformes las demandantes apelaron para ante esta Corte Suprema señalando en su alegato la comisión de dos errores, así:

"I.—Que la corte inferior erró al declarar, concluir y fallar que la Ley núm. 49 de agosto 7 de 1935, ya citada, es constitucional y válida.

"II.—Que igualmente erró dicha corte al dictar sentencia desestimando la demanda enmendada de estas apelantes."

■■ Ambos errores serán estudiados y resueltos conjuntamente.

La ley cuya declaración de nulidad se solicita es como sigue (Sesión Extraordinaria de 1935, pág. 539):

"LEY para regular las horas de trabajo de las personas empleadas en los establecimientos comerciales, industriales y en otros negocios lucrativos, y para otros fines.

"Decrétase por la Asamblea Legislativa de Puerto Rico:

"Sección 1.—A ninguna persona se le empleará o se le permitirá que trabaje en ningún establecimiento comercial, industrial, agrícola o en cualquier otro negocio lucrativo, más de ocho (8) horas durante cualquier día natural, excepto cuando ocurriere cualquier

evento extraordinario, o cualquiera emergencia causada por fuego, hambre o inundación, por peligro a la vida, a la propiedad, a la seguridad o salud pública, o en cualquiera otra circunstancia especial, siempre que el Gobernador de Puerto Rico por recomendación del Comisionado del Trabajo declarare subsiguientemente que las disposiciones de esta ley no deberán aplicarse a estos casos excepcionados y que por lo tanto las infracciones cometidas han sido excusables; *Disponiéndose,* que la limitación de ocho (8) horas establecida por esta sección, y en todos los trabajos normales, fuera de las excepciones ya anotadas, puede ser ampliada a un período que no excederá de nueve (9) horas durante cualquier día natural, a condición de que a toda persona de ese modo empleada a salario, jornal o en otra forma, por más de ocho (8) horas durante cualquier día natural, se le pagará por el trabajo que haga durante tal período extra, a un tipo que sea doble del salario que se le esté pagando por hora de trabajo precedentes.

"Sección 2.—En los casos en que existiere la amenaza de perderse una cosecha por falta de brazos, o de que no hubiere suficiente personal disponible para despachar un embarque de frutas o de cualquiera otro producto perecedero, el Gobernador de Puerto Rico, mediante recomendación del Comisionado del Trabajo, podrá suspender temporalmente para tales casos específicos los efectos de esta Ley en cuanto a la limitación de horas, pero no así en cuanto al tipo de jornal doble que se establece como pago por las horas que se trabajaren en exceso de las ocho (8) horas diarias de labor que fija esta Ley.

"Sección 3.—Todo patrono fijará en un sitio visible del establecimiento, planta, finca o sitio de trabajo, según fuere el caso, un anuncio impreso expresando el número de horas de trabajo que. se exige diariamente a los empleados durante cada día de la semana, las horas de comenzar y terminar el trabajo, la hora en que empieza y termina el período destinado a tomar los alimentos; *Disponiéndose,* que el tiempo señalado para tomar los alimentos no será menor de una hora.

"En los establecimientos comerciales, industriales, agrícolas o destinados a otros negocios lucrativos donde se empleen personas con horas alternadas durante todos los días de la semana, deberá fijarse un aviso especial, haciendo constar el nombre de cada uno de los empleados, y las horas que trabajen en cada día de la semana.

"Las horas fijadas en los avisos constituirán evidencia prima facie de que tales horas de trabajo en cada establecimiento constituirán la división de la jornada legal.

"Es obligación de todo patrono solicitar los modelos impresos de estos avisos, los cuales serán suministrados gratuitamente por el Departamento del Trabajo.

"Sección 4.—En esta Ley, a menos que del contexto de ella se deduzca otra cosa, se aceptarán las siguientes definiciones de palabras y frases de la misma:

" 'Patrono' incluye toda persona natural o jurídica y el administrador, superintendente, capataz, mayordomo y representante de dicha persona natural o jurídica.

" 'Ocupación lucrativa' incluye toda obra o todo trabajo en factorías, molinos, centrales, talleres de maquinaria o establecimiento o sitio de cualquier clase donde haya una fábrica o empresa mecánica, y en almacenes, tiendas, establecimientos o sitio de cualquier clase, donde se realizan operaciones mercantiles; en fincas, haciendas estancias o sitios de cualquier clase, en los cuales se dirijan empresas agrícolas de horticultura o pastoreo, y en toda empresa de minería o pesquería o de cualquiera otra índole, industrial, comercial o agrícola.

" 'Establecimiento' incluye todo edificio, fábrica, taller, tienda o sitio de carácter análogo en el cual se realice alguna ocupación lucrativa.

" 'Plantación' incluye toda hacienda, estancia u otro lote de tierra en que se ejerza alguna ocupación lucrativa.

"Sección 5.—El Departamento del Trabajo queda por la presente autorizado y se le ordena que ponga en vigor las disposiciones de esta Ley, para perseguir las infracciones a la misma, para citar testigos, tomar juramentos y declaraciones, obligar la presentación de libros, nóminas de pago, documentos y cualquiera otra evidencia, y para visitar y examinar por medio de su jefe o de los auxiliares que éste designe, lós edificios de cualquier establecimiento o finca a que se refiere esta Ley.

"En el cumplimiento de los deberes que por esta sección se le imponen, podrá utilizar los servicios de la fuerza policíaca, los fiscales de distrito, jueces municipales o de paz, y los márshals de todas las cortes.

"Sección 6.—Lo que constituye una 'emergencia', un 'evento extraordinario', una 'circunstancia especial', o cualquiera otra condición que justifique la suspensión temporal de cualquiera de las disposiciones de esta Ley de acuerdo con las anteriores secciones de la misma, lo determinará el Comisionado del Trabajo con la aprobación del Gobernador de Puerto Rico.

"Sección 7.—Esta Ley no afectará ni invalidará en forma alguna las disposiciones vigentes de la Ley núm. 80, aprobada en 5 de mayo de 1931 y enmendada en 15 de abril de 1935, en cuanto a la concesión de permisos por el Comisionado del Trabajo para trabajar horas extras en la terminación de trabajos urgentes o necesarios que deben efectuarse dentro de tiempo determinado en talleres, fábricas, factorías, o cualquiera establecimiento industrial, comercial o agrícola, ni en cuanto al pago de un tipo doble de compensación por horas extras fijado en la misma. Tampoco disminuirá el alcance ni modificará ó derogará en forma alguna las disposicones de la Ley núm. 54 aprobada en abril 28 de 1930, enmendando el Artículo 553 del Código Penal de Puerto Rico, cuya Ley por la presente se declara en todo su vigor y efecto. Tampoco serán afectadas ni invalidadas las disposiciones de la Ley núm. 73, 'Regulando el Trabajo de Mujeres y Niños y Protegiéndolos contra Trabajos Peligrosos', aprobada en 21 de junio de 1919 y enmendada en 24 de abril de 1930, la que también se declara en todo su vigor y efecto.

"Sección 8.—Todo patrono que infrinja esta Ley, o alguna sección o disposición de la misma, será culpable de delito menos grave (*misdemeanor*) y castigado con multa que no será menor de veinticinco (25) dólares, ni mayor de cien (100) dólares, o cárcel por un período no menor de cinco (5) días ni mayor de treinta (30) días, o ambas penas a discreción del tribunal; en caso de reincidencia se le impondrá una multa no menor de cien (100) dólares ni mayor de mil (1,000) dólares, o cárcel por un período no menor de treinta (30) días ni mayor de noventa (90) días, o ambas penas a discreción del trbiunal.

"Sección 9.—Toda ley o parte de ley que se oponga a la presente, queda por ésta derogada.

"Sección 10.—Esta Ley empezará a regir a los noventa días después de su aprobación.

"*Aprobada en 7 de agosto de 1935.*"

Y los motivos de inconstitucionalidad que se alegan son, substancialmente, siete, a saber:

1. Que la limitación contenida en la sección primera de la ley menoscaba las obligaciones de los contratos ya celebrados por las demandantes con sus empleados y constituye una limitación de la libre contratación, violando la sección 2, incisos 1, 5 y 9 de nuestra Ley Orgánica así como la En-

mienda XIV, sección primera de la Constitución de los Estados Unidos de América.

2. Que la dicha sección primera contiene una delegación al poder ejecutivo de facultades y funciones que competen al poder judicial violando las disposiciones de la Ley Orgánica y de la Constitución relativas a la separación de poderes.

3. Que la repetida sección viola el principio sobre igual protección y aplicación de las leyes contenido en la sección 2 de la Ley Orgánica y en la sección 1 de la enmienda 14 a la Constitución, en tanto en cuanto se priva a las demandantes de la protección del poder judicial y de las leyes sustantivas y adjetivas que protegen los derechos de los ciudadanos.

4. Que los motivos de anticonstitucionalidad 2 y 3 se aplican a la sección 6 de la ley en tanto en cuanto dispone que lo que constituye "emergencia", "evento extraordinario", "circunstancia especial", lo determinará el Comisionado del Trabajo con la aprobación del Gobernador.

5. Que por la sección 8 se crea y castiga un nuevo delito sin que en el título de la ley se haga referencia al mismo violándose de tal modo la sección 34 de la Ley Orgánica.

6. Que haciéndose aplicables las disposiciones de la sección primera a todos los empleados, en cuanto comprende a las demandantes que son compañías mercantiles, constituye un ejercicio excesivo y arbitrario del poder de policía.

7. Que en tanto en cuanto se impone un castigo consistente en multa o cárcel, las demandantes que son compañías mercantiles quedan expuestas a ser privadas de su propiedad sin el debido proceso de ley.

Para basar su contención citan las apelantes en primer término el caso de *Lochner* v. *New York,* 198 U. S. 45. En dicho caso la Corte Suprema de los Estados Unidos por una mayoría compuesta por sólo cinco de sus jueces declaró anticonstitucional un estatuto del estado de Nueva York que prohibía a panaderos y reposteros trabajar más de diez horas al día, cuya constitucionalidad había sido sostenida por

la Corte de Apelaciones estadual. Disintieron los Jueces Señores Harlan, White y Day, emitiendo el primero su opinión con la cual estuvieron conformes sus colegas. Disintió también el Juez Señor Holmes, que expuso sus motivos separadamente.

La opinión de la corte fué emitida por el Juez Señor Peckham. Lochner fué condenado por violar la sección 110 de la Ley del Trabajo del estado de Nueva York que ordena:

"Sección 110.—*Horas de trabajo en las panaderías y confiterías.*— No se requerirá ni permitirá a ningún empleado que trabaje en ninguna fábrica de galletas, panadería, repostería o confitería más de sesenta horas en cada semana o más de diez horas por día, a no ser con el fin de trabajar menos horas el último día de la semana; ni más horas en cada semana que aquéllas que hagan un promedio de diez horas por día, durante los días de la semana en que tal empleado trabaje."

Y la opinión, tras un estudio detenido de todas las cuestiones envueltas, termina diciendo:

"Es evidente que la limitación en las horas de trabajo provista en esta sección del estatuto que sirvió de base a la acusación y a virtud de la cual fué convicto el demandante en el recurso de error, no tiene una relación tan directa ni un efecto tan substancial sobre la salud del empleado que nos justifique en considerarla realmente como una ley sanitaria. A nuestro juicio el verdadero fin y objeto fueron simplemente reglamentar las horas de trabajo entre patrono y empleado (siendo todas personas *sui juris*), en los negocios privados que no fueran en forma alguna dañinos a la moral o de una manera real y efectiva perjudicial a la salud del empleado. Bajo tales circunstancias la libertad que entre patrono y empleado existe para contratar entre sí en relación con su empleo, y al definir éste, no puede ser prohibida o menoscabada sin violar la Constitución Federal.

"La sentencia de la Corte de Apelaciones de Nueva York así como aquélla de la Corte Suprema y de la Corte del Condado de Oneida, deben ser revocadas y devolverse el caso a la Corte del Condado para ulteriores procedimientos no inconsistentes con esta opinión."

El Juez Señor Harlan estudia también en su opinión disidente todas las cuestiones envueltas y, en parte, dice:

"Admitiendo entonces que existe la libre contratación y que ésta no puede ser violada aun bajo la sanción de una disposición legislativa directa, pero asumiendo según podemos asumir de acuerdo con el derecho ya establecido, que tal libertad de contratación está sujeta a aquellas reglamentaciones que el estado pueda razonablemente prescribir para el bien común y en beneficio de la sociedad, ¿cuáles son las condiciones en cuya virtud el poder judicial puede declarar que dichas reglamentaciones son en exceso de la facultad legislativa y por ende nulas? Sobre este punto no hay lugar a divergencias de criterio, puesto que la regla es universal, que una disposición legislativa, ya fuere federal o estadual, nunca debe ser ignorada o considerada nula a menos que, fuera de toda duda, la misma sea clara y palpablemente en exceso del poder legislativo. En Jacobson v. Massachusetts, supra, dijimos que la facultad que tienen las cortes para revisar actuaciones legislativas con respecto a una cuestión que afecte el bienestar público, existe tan sólo 'cuando lo que ha sido hecho por la Legislatura cae dentro de la regla de que si un estatuto que se supone haber sido aprobado para proteger la salud pública, la moral pública o el bienestar público, no tiene relación real o efectiva con tales objetos, o constituye fuera de toda duda, una invasión clara y palpable de los derechos garantizados por la ley fundamental'— citando *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Minnesota* v. *Barber*, 136 U. S. 313; 320; *Atkin* v. *Kansas*, 191 U. S. 207, 223. Si existe duda respecto a la validez del estatuto esa duda en su consecuencia debe ser resuelta en favor de su validez, y las cortes no deben intervenir sino dejar a la Legislatura que asuma la responsabilidad al haber aprobado legislación poco sabia. Si el fin que la Legislatura trata de cumplir es uno hasta el cual se extienden sus facultades, y si los medios utilizados para lograr tal fin, aunque no sean los más sabios ni los mejores, no están sin embargo clara y palpablemente prohibidos por la ley, entonces las cortes no pueden intervenir. En otras palabras, cuando se ataca la validez de un estatuto, el peso de la prueba, para así decir, recae sobre aquéllos que sostienen su inconstitucionalidad. *McCulloch* v. *Maryland*, 4 Wheat. 316, 421.

"Apliquemos esos principios al presente caso."

".        .        .    .        .        .        .

"Es claro que éste estatuto fué aprobado con el objeto de proteger el bienestar material de las personas que trabajan en panaderías y confiterías. Podría ser que el estatuto tuviera por origen, en parte, la creencia de que los patronos y empleados de tales establecimientos no estaban situados en la misma base, y de que las necesidades de estos últimos con frecuencia les compelían a someterse a tales exigen-

cias que indebidamente minaban sus fuerzas. Sea ello como fuere, el estatuto debe interpretarse en el sentido de que expresa la creencia de los habitantes de Nueva York de que por regla general y en el caso del hombre promedio, un trabajo que exceda de 60 horas por semanas en tales establecimientos, puede poner en peligro la salud de aquéllos que así trabajen. Si esta legislación es o no sabia, ello es algo que no incumbe a las cortes determinar. Bajo nuestro sistema de gobierno a las cortes no les interesa la sapiencia o política de la legislación. De forma pues, que al determinar la cuestión de la facultad para intervenir en la libre contratación, las cortes pueden investigar si los medios prescritos por el estado son germanos con un fin que puede ser legalmente cumplido y si éste tiene una relación real y efectiva con la protección de la salud, conforme ésta queda envuelta por la labor diaria de las personas, ya fueren hombres o mujeres, que estuvieren empleados en panaderías o confiterías. Mas al iniciar esta investigación encuentro que es imposible, dada la experiencia corriente, decir que en este caso no existe una relación real y efectiva entre los medios empleados por el estado y el fin que se trata de realizar a virtud de su legislación. *Mugler* v. *Kansas,* supra. Tampoco puedo decir que el estatuto no tiene una relación apropiada o directa con la protección a la salud que cada estado debe a sus ciudadanos. *Patterson* v. *Kentucky,* supra; o que no promueve la salud de los empleados en cuestión, *Holden* v. *Hardy, Lawton* v. *Steele,* supra; o que la reglamentación prescrita por el estado sea enteramente irrazonable y extravagante o totalmente arbitraria, *Gundling* v. *Chicago,* supra. Mucho menos puedo decir que el estatuto sea, fuera de toda duda, una invasión clara y palpable de los derechos garantizados por la ley fundamental. *Jacobson* v. *Massachusetts,* supra.''
''  .      .      .      .      .      .      .      .      .

''Las estadísticas demuestran que el período diario de labor entre los trabajadores en los distintos países es, en Australia, 8 horas; en Gran Bretaña, 9; en los Estados Unidos, 9¾; en Dinamarca, 9¾; en Noruega, 10; en Suecia, Francia y Suiza 10½; en Alemania 10¼; en Bélgica, Italia y Austria, 11; y en Rusia, 12.

''Sabemos judicialmente que la cuestión relativa al número de horas durante las cuales un obrero debe trabajar continuamente, ha sido durante largo tiempo, y aun es, objeto de seria consideración por los pueblos civilizados y por aquéllos que tienen conocimiento especial de las leyes sanitarias. . . .''
''  .      .      .      .      .      .      .      .      .

''Permítaseme decir que el estatuto de Nueva York, en los particulares aquí envueltos, no puede resolverse que está en conflicto con

la Enmienda Catorce, sin ampliar el alcance de la enmienda mucho más allá de su fin original y sin traer bajo la supervision de esta corte, cuestiones que se suponen haber pertenecido exclusivamente a los departamentos legislativos de los varios estados al ejercer su facultad admitida de proteger la salud y seguridad de sus ciudadanos mediante aquellos reglamentos que a su juicio considere más sabios. Las leyes sanitarias de toda índole constituyen, dijo el Juez Presidente señor Marshall, parte de aquel cúmulo de legislación que 'abarca cuanto está dentro de los límites territoriales del estado, que no ha sido cedido al Gobierno General; cuanto pueda ser ejercitado ventajosamente por los estados mismos.' *Gibbons* v. *Ogden*, 9 Wheat. 1, 203. Una decisión al efecto de que el estatuto de Nueva York es nulo a tenor de la Enmienda Catorce, a mi juicio, acarrearía consecuencias de naturaleza tremendas y altamente perjudiciales, puesto que tal decisión seriamente mutilaría el poder inherente de los estados para cuidar de las vidas, salud y bienestar de sus ciudadanos. Son ésas cuestiones que pueden mejor ser controladas por los estados. La conservación de los justos poderes de los estados es tan vital como la preservación de los poderes del Gobierno General.''

Se hablaba en 1904. De entonces acá, el avance ha continuado. Del alegato de la parte apelada tomamos lo siguiente:

''Cuando finalizó la Gran Guerra, en el Tratado de Paz suscrito en Versalles por las principales potencias del mundo, al instituirse la Sociedad de las Naciones como instrumento para conservación de la paz universal, se declaró que ésta no puede estar fundada más que sobre la base de la justicia social, y 'considerando que existen condiciones de trabajo que implican para numerosas personas la injusticia, la miseria y las privaciones, lo cual engendra un descontento tal, que la paz y la armonía universal corren peligro, y que es urgente mejorar estas condiciones, por ejemplo, en lo que concierne a la reglamentación de las horas de trabajo, la fijación de la duración máxima de la jornada de la semana de trabajo, etc.', y 'reconociendo que el bienestar físico, moral e intelectual de los trabajadores asalariados es de una importancia esencial desde el punto de vista internacional,' se creó la Oficina Internacional del Trabajo. Y las Altas Partes Contratantes afirman en el artículo 427 del célebre Tratado:

'' 'Reconocen que la diferencia de clima, de costumbres y de usos, de oportunidad económica y de tradición industrial privan de momento la uniformidad absoluta de las condiciones de trabajo. Pero, persuadidas de que éste no debe ser considerado simplemente como

un artículo de comercio, piensan que existen métodos y principios para la reglamentación de sus condiciones, que todas las comunidades industriales deben aplicar en tanto las circunstancias especiales en que puedan encontrarse se lo permitan.

" 'Entre estos métodos y principos parecen de una importancia particular y urgente, los siguientes:

" '1.—Que el trabajo no debe considerarse simplemente como una mercancía o artículo de comercio.

" '2.—El derecho de asociación no contrario a las leyes, lo mismo para los obreros que para los patronos.

" '3.—El pago de los trabajadores de un salario que les asegure un nivel conveniente tal, que le comprenda en el tiempo y en su país.

" '4.—*La adopción de la jornada de 8 horas, o de la semana de 48, donde no esté implantada.*

" '5.—Reposo periódico de 24 horas como mínimo, que debe comprender los domingos, siempre que sea posible.

" '6.—La supresión del trabajo de los niños y la obligación de establecer en el trabajo de muchachos de ambos sexos las limitaciones necesarias para permitirles continuar su educación y asegurar su desarrollo físico.

" '7.—El principio de salario igual, sin distinción de sexo, para un trabajo de igual valor.

" '8.—La reciprocidad de tratos económicos entre obrero nacional y obrero extranjero.

" '9.—Cada Estado debe organizar un servicio que comprenderá mujeres, a fin de garantizar la aplicación de las leyes y reglamentos para la protección de los trabajadores.'

"En la primera reunión anual de la Conferencia Internacional del Trabajo, celebrada en Washington en 1919, con asistencia de todas las naciones signatarias del Tratado de Versalles y de las que luego hicieron su adhesión al pacto de la Sociedad de Naciones, se aprobó un convenio internacional limitando a ocho horas la jornada de trabajo y a cuarenta y ocho horas el límite de trabajo a la semana. Veintidós naciones han ratificado ya este convenio, figurando entre ellas: Alemania, Argentina, Australia, Austria, Bélgica, Brasil, Canadá, Checoeslovaquia, Chile, Colombia, España, Francia, Italia, Holanda, Polonia y Suecia. (Revista Internacional del Trabajo, Vol. XII, núm. 1, julio de 1935.)

"La jornada de 8 horas rige, asimismo, en los siguientes estados que han aprobado leyes especiales sobre la materia: Bulgaria, China, Cuba, República Dominicana, Estonia, Grecia, Hungría, India, La-

tonia, Lituania, Ecuador, Méjico, Nicaragua, Nueva Zelandia, Portugal, Rumanía, Uruguay, Venezuela y Yugoeslavia.

"En la XIX reunión de la Conferencia Internacional del Trabajo, celebrada en Ginebra este año, se aprobó un proyecto de convenio que consagra 'el principio de la semana de 40 horas, aplicado en tal forma que no implique disminución en el nivel de vida de los obreros.'

"De manera, que el espíritu prevaleciente en la actualidad en los países más avanzados del mundo es el de limitar a 40 horas, la semana de trabajo...."

Que la opinión de la minoría en el repetido caso de Lochner, supra, era la correcta, lo reconoció implícitamente la propia Corte Suprema doce años más tarde al declarar constitucional una ley del estado de Oregon cuya sección segunda prescribía:

"Sección 2.—Ninguna persona será empleada en cualquier molino, factoría o establecimiento industrial en este Estado más de 10 horas diarias, excepto los guardianes (*watchmen*), empleados dedicados a hacer reparaciones de emergencia en que haya peligro para la vida o la propiedad; disponiéndose sin embargo, que los empleados pueden hacer trabajo extra (*work overtime*) siempre que no exceda de 3 horas en cualquier día, y bajo la condición de que cada unidad de tiempo extra, se pague a razón de salario y medio del convenido para la misma unidad de trabajo regular."

Se impugnó dicha ley como contraria a la enmienda catorce de la Constitución por intervenir con el derecho a la libre contratación, violar el derecho a la propiedad y constituir una legislación de clase, como ahora se impugna la de Puerto Rico. La Corte Suprema estadual declaró sin lugar la impugnación sosteniendo la constitucionalidad de la ley, y apelado el caso a la Corte Suprema nacional, ésta, sin hacer referencia al caso de Lochner, supra, confirmó la sentencia recurrida.

La opinión de la corte lo fué como en el caso de Lochner, supra, por una mayoría de cinco Jueces, disintiendo el Juez Presidente señor White y los Jueces señores Devanter y Mc Reynolds. El Juez señor Brandeis no intervino. La ma-

yoría la formaron los Jueces señores McKenna, Holmes, Day, Pitney y Clarke, emitiendo la opinión el primero. De ella transcribimos lo que sigue:

"Mas no es necesario que hagamos pesquisas a fin de determinar las razones que hubo para el criterio legislativo. No se nos requiere que estemos seguros de las razones precisas para su ejercicio, ni que estemos convencidos de la sabiduría del mismo. *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 365. Basta para nuestro fallo que la legislación que se está considerando fuera aprobada en el ejercicio de una facultad gubernamental admitida; y el hecho de que no sea tan completa como podría serlo ni tan rígida en sus prohibiciones, da quizás lugar a mucha laxitud, es más leve en sus penalidades de lo que podría serlo, no milita contra su legalidad. Esto podría ser un defecto que diera lugar a crítica y a diferencias de criterio, pero la validez constitucional de la legislación no puede determinarse por el grado de precisión de sus disposiciones o remedios. Las nuevas normas son de ordinario tentativas en sus comienzos y avanzan en firmeza a medida que avanzan en aceptación. De la mente legislativa nunca salen perfectas en su alcance o aplicación. Puede que el tiempo sea necesario para ajustarlas a las costumbres y condiciones y a medida que se justifican o que dejan de hacerlo, pasan del período de prueba al triunfo, del de duda a la derogación.

"Echando a un lado las consideraciones generales y volviendo a la cuestión inmediata que nos concierne, o sea, la validez del ejercicio de la facultad en la Ley de Oregon, nuestra opinión de la misma es que no infringe los límites constitucionales.

"Este caso ha sido sometido por el demandante bajo la contención de que la ley es una sobre jornales y no una que determina el número de horas de trabajo, y basa su caso en esa contención. Hacia la misma dirigimos nuestra decisión y no discutimos ni consideramos las contenciones más amplias de los letrados del estado que tienden a justificar la ley aun si se tratara de una sobre reglamentación de sueldos.

"Se sostiene que la ley aun considerada como una que reglamenta las horas de labor, no es necesaria o útil 'para la conservación de la salud de las personas empleadas en molinos, factorías y establecimientos fabriles.' De los autos no surgen hechos que sostengan esta contención, y contra ella está el criterio de la legislatura y de la Corte Suprema, que dijo: 'En vista del bien conocido hecho de que las costumbres en nuestras industrias no sancionan un día de trabajo de más de 10 horas, no puede resolverse, como cuestión de derecho, que el requisito legislativo sea irrazonable o arbitrario en lo que a las

horas de trabajo se refiere. . . .' '' *Bunting* v. *Oregon,* 243 U.S. 426,'437.

Que el caso de Lochner quedó desde entonces virtualmente derogado ha sido bien entendido por jueces y juristas. De la resolución de la corte de distrito transcribimos a este respecto lo que sigue:

"El caso de *Bunting* v. *Oregon* indudablemente revocó el anterior de Lochner *v.* New York. Así lo entendió el Juez Presidente Taft cuando dijo que el caso de *Lochner* había sido revocado *sub silencio* por el de *Bunting* v. *Oregon.*

"El Dean Burdick del Colegio de Leyes de la Universidad de Cornell, en su reciente obra 'La Ley de la Constitución Americana', pág. 581, refiriéndose al caso de *Bunting* v. *Oregon,* supra, dice lo siguiente:

" 'Este estatuto (el de Oregon) fué declarado constitucional en una breve opinión en que se acepta sin discusión la constitucionalidad de la reglamentación de las horas de trabajo, y el caso de Lochner ni siquiera se menciona aunque en principio está indudablemente. revocado.'

"El extinto Juez Holmes refiriéndose a la mención que del caso de Lochner se hace en el de *Adkins* v. *Children's Hospital,* 67 L. ed. 785 (un caso sobre salario mínimo a mujeres), dijo:

" 'Yo suponía. . . . que al caso de *Lochner* v. *New York,* 198 U. S. 45, se le concedería un merecido descanso.'

"Además de los juristas antes mencionados, opinan y consideran revocado el caso de *Lochner* v. *New York,* el Juez Learned Hand de la Corte de Circuito de Apelaciones del Segundo Circuito, el Prof. Freund, el Prof. Handler de Columbia, el Prof. Frankfurter, y el Dean Roscoe Pound del Colegio de Leyes de la Universidad de Harvard. Véase al efecto el artículo del Prof. Frankfurter titulado 'Horas de Labor y el Realismo en el Derecho Constitucional' publicado en 29 Harvard Law Review, 353, 371 y el del Juez Learned Hand titulado 'Debido Procedimiento de Ley y el Día de 8 horas' publicado en 21 Harvard Law Review, 495.''

Se cita una opinión de la Corte Suprema de Nuevo Méjico, la emitida en el caso de *State* v. *Henry,* 90 A.L.R. 805, para sostener el criterio contrario, pero sus razonamientos no nos convencen.

Examinado el estatuto de Puerto Rico a la luz de lo. que llevamos expuesto, se concluye fácilmente que fué decretado por la Legislatura dentro de sus facultades. Pero se insiste por las apelantes en que es arbitrario por ser de aplicación general a todos los empleados sin tomar en consideración la naturaleza del empleo. No tienen razón, a nuestro juicio.

Volviendo al caso de Bunting, esta vez a la opinión de la Corte Suprema estadual, encontramos en ella lo que sigue:

"Es también una máxima de Derecho Constitucional que se presume que una legislatura actúa dentro de las limitaciones constitucionales, con conocimiento completo de los hechos y con el propósito de promover el interés público y que las cortes no deben fácilmente resolver que la legislatura al aprobar una ley ha traspasado las limitaciones constitucionales. La legislatura es el juez exclusivo de la corrección y necesidad de la ley. Si puede existir un estado de hechos que justifique una ley, se presumirá que tal estado de hechos existe...." *State* v. *Bunting*, 71 Ore. 259, L.R.A. 1917–C, 1165.

Y no sólo puede concluirse aquí que "puede existir" un estado de hechos que justifique una ley general como la que estamos examinando, aplicable a empleados como los de las sociedades mercantiles demandantes, si que a nuestro juicio tal estado de hechos existe. Dice a este respecto la corte sentenciadora:

"Es de conocimiento público la costumbre introducida en esta Isla, de proporcionar oportunidad a las personas que trabajen durante el día para tomar cursos nocturnos. Se han creado no sólo escuelas nocturnas para enseñar a leer y escribir, reduciendo así el analfabetismo que tanto nos perjudica en la consecución de derechos políticos, si que también tenemos cursos de artes y oficios, de escuela secundaria y universitarios. Una persona que trabaje 8 horas solamente, está en mejores condiciones físicas y mentales que el que trabaja 10 ó 12 horas diarias, para estudiar por la noche en una escuela o universidad y ampliar así sus conocimientos en su arte u oficio, o hacerse de una profesión. No es menos sabido que el cansancio físico o mental es una impedimenta para el estudio. Esta sola consideración, independientemente de las razones de salud que concurren, sería suficiente para que una persona razonable descubra en la ley de 7 de agosto de 1935 el propósito de promover el bienestar público.

En otras palabras, no puede decirse que al reducir la jornada a 8 horas, la legislatura ha actuado injusta o arbitrariamente, y siendo ello así, la legislación cae bajo el 'police power'' y se justa a lo dispuesto en el inciso 10 del artículo 2 de la Ley Orgánica que dice así:

'' 'Nada de lo contenido en esta ley será interpretado en el sentido de limitar la facultad de la Asamblea Legislativa para decretar leyes para la protección de la vida, salud y seguridad de empleados y obreros.' ''

No es sólo el bienestar de los empleados lo que tiende a asegurar y fomentar la ley que se impugna, si que también el de los patronos y el del público en general.

Ocho horas de trabajo de un empleado sano, alegre y fuerte, que se ilustra constantemente y se siente satisfecho dentro del régimen de justicia social en que vive, rinden más que diez o doce o catorce de ese mismo empleado agotado por el exceso de su esfuerzo, o contrariado por la privación de libertad que implica un tiempo tan largo y continuo de sujeción, o abatido o enconado al sentirse víctima de un régimen claramente discriminatorio en contra suya, discrimen que viene de tan lejos que pasa como algo natural y justo, como lo que debe ser a fin de que el orden y la economía social no se alteren.

Y en cuanto al pueblo en general sólo mentes estrechas pueden dejar de percibir lo que para su bienestar significa el ser servido por patronos y empleados que actúan comenzando por servirse a sí mismos, respetándose y ayudándose mutuamente.

La experiencia demuestra que cuando estas leyes se aceptan y aplican de buena fe por patronos y empleados, el negocio no sufre; al contrario, la ganancia equitativa crece y surge una situación de mutua confianza y verdad que contribuye eficazmente a la dignificación de todos los seres humanos y por consiguiente a su bienestar.

Es cierto que en muchos casos las horas sobrantes se pierden en la ociosidad generadora del vicio o en el vicio mismo y el empleado entonces en vez de mejorar, degenera.

Pero ésa es la excepción y no la regla. El progreso es generalmente armónico en las sociedades y cuando éstas llegan a un estado de civilización que permite la adopción de leyes como la que estamos considerando, ya cuentan en su seno con organizaciones religiosas, de recreo y culturales bien preparadas para proporcionar a los empleados el medio de usar su tiempo sobrante en su perfeccionamiento físico, intelectual y espiritual. Y son los patronos de certera visión los que mayores esfuerzos hacen por sostener debidamente esas instituciones y por guiar hacia ellas a sus empleados.

La justicia, esto es, dar a cada uno lo que es suyo, constituye la base más firme y perdurable del bienestar social y cuando en ella se inspira la Legislatura y dicta leyes dentro de sus facultades claramente tendientes a asegurarlo, la constitucionalidad de esas leyes debe ser vigorosamente sostenida por los tribunales, porque éllas están dentro de la letra vivificada por el espíritu de la Constitución. No fué un gobierno de clases, de privilegios el que la Constitución organizó. Fué un gobierno del pueblo, por el pueblo y para el pueblo el que quedó por ella consagrado.

Tampoco es arbitrariamente discriminatoria la ley. "No existe el discrimen arbitrario entre las personas empleadas en los establecimientos comerciales, industriales y otros negocios lucrativos y las empleadas no dedicadas a tales negocios", dijo con razón la corte de distrito en su resolución fundada, y agregó: "La ley de Oregon cuya constitucionalidad fué sostenida por el Tribunal Supremo de aquel Estado y por el Tribunal Supremo Nacional, en el caso de *Bunting* v. *Oregon,* estaba concebida, como hemos visto, en iguales términos que la nuestra, y no se resolvió que tal discrimen existiese. Además, no se habrá ocultado a nuestra legislatura al aprobar la ley impugnada, la tendencia que existe en los negocios lucrativos de obtener del obrero o empleado el mayor beneficio posible, mientras que no existe la misma tendencia cuando se trata de otros empleos en que no hay el incentivo del lucro."

■ Por el hecho de que la Legislatura otorgara al Comisionado del Trabajo con la aprobación del Gobernador la facultad de determinar lo que constituía "emergencia", "evento extraordinario" y "circunstancia especial" a los efectos de la suspensión de la ley, no se violó a nuestro juicio el principio constitucional de la división de poderes.

En el caso de *Hampton & Co.* v. *United States,* 276 U. S. 394, 405, la Corte Suprema dijo:

"La bien conocida máxima '*Delegata potestas non potest delegare,*' aplicable a la ley de agencia tanto en la ley general como en el derecho común, es bien entendida, y ha tenido mayor aplicación en la interpretación de la Constitución Federal y de las constituciones estaduales que en el derecho privado. La Constitución Federal y las constituciones estaduales de este país dividen los poderes gubernamentales en tres ramas: la primera es la legislativa; la segunda, la ejecutiva, y la tercera, la judicial; y la regla es que en la administración del gobierno el Congreso o la Legislatura deben ejercer el poder legislativo, el Presidente o el Ejecutivo del estado, es decir, el Gobernador, el poder ejecutivo, y las cortes o la judicatura, el poder judicial, y el hacer efectiva esa división constitucional, constituye una violación de la Ley Fundamental Nacional, si el Congreso cede su poder legislativo y lo pasa al Presidente y a la rama judicial, o si por ley trata de investirse a sí mismo o de investir sus miembros del poder ejecutivo o del poder judicial. Esto no equivale a decir que las tres ramas no sean partes coordinadas de un gobierno y que cada una de ellas en el campo de sus obligaciones no pueda invocar la acción de las otras dos ramas en tanto en cuanto la acción así invocada no equivalga a una invasión del campo constitucional de la otra rama. Para determinar qué puede hacer al solicitar ayuda de otra rama, el alcance y la naturaleza de esa ayuda deben ser fijados de acuerdo con el sentido común y con las necesidades inherentes de coordinación gubernamental.

"El campo del Congreso envuelve muchas variedades de acción legislativa, y con frecuencia al Congreso le ha sido necesario utilizar funcionarios de la rama ejecutiva, dentro de ciertos límites definidos, para asegurar el efecto exacto deseado por sus actos legislativos, invistiendo a tales funcionarios de la discreción necesaria para aprobar reglamentación pública, interpretando el estatuto y prescribiendo los detalles necesarios para su ejecución, aun al extremo de imponer la pena por la violación de tales reglamentos.

*United States* v. *Grimaud,* 220 U. S. 506, 518; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Buttfield* v. *Stranahan,* 192 U. S. 470; *In re Kollock,* 165 U. S. 526; *Oceanic Navigation Co.* v. *Stranahan,* 214 U.S. 320.''

Los procedimientos judiciales son lentos por regla general. La propia legislatura fué cuan lejos pudo en materia de definiciones en la ley.  No le era dable determinar de antemano la existencia de las situaciones extraordinarias de que trata. Su sentido común le indicó que la coordinación gubernativa resultaría más eficiente y más práctica encomendando la facultad a la rama ejecutiva que a la judicial, y así lo hizo. El derecho de los ciudadanos para recurrir en propios casos a los tribunales no quedó con ello abrogado.

■ Por último deseamos consignar, aunque parece que este motivo de nulidad fué abandonado ya que no se argumenta en el alegato de las apelantes, que no creemos que la ley que se impugna viole la sección 34 de nuestra Ley Orgánica porque en su título no se refiera expresamente a la sanción penal que su sección sexta contiene.

El objeto de esa prohibición constitucional, como dijo la Corte Suprema de los Estados Unidos hablando por el Juez señor Field en el caso de *Louisiana* v. *Pilsbury,* 105 U. S. 278, 289, es, ''impedir la práctica, corriente en los cuerpos legislativos en que tal provisión no existe, de incorporar en el mismo proyecto de ley materias incongruentes, sin relación entre sí o con el objeto especificado en el título, a virtud de la cual frecuentemente se adoptan, sin llamar la atención, medidas que de haber sido conocidas, hubieran tenido oposición, y sido derrotadas.  Esto sirve así para evitar sorpresas en la legislación.  Pero no fué el propósito prohibir la unión en el mismo proyecto, de diferentes disposiciones si ellas son germanas con la materia general indicada en el título.''  Y esta propia Corte Suprema, en el caso del *Pueblo* v. *Arrocho,* 34 D.P.R. 847, citó y aplicó la siguiente jurisprudencia tal como se encuentra resumida en Ruling Case Law, a saber:

"Una ley no es anticonstitucional porque contenga más de una materia cuando las distintas materias son afines al asunto principal, o se relacionan directa o indirectamente con el asunto principal, y tienen una relación mutua con el asunto de la Ley, sin ser extrañas a la misma, o cuando las disposiciones de la ley son de igual naturaleza y legítimamente caen bajo el mismo tópico." 25 R. C. L. 844.

"Puesto que un estatuto puede comprender todas las materias afines al asunto principal, puede incluir todos los medios que puedan ser justamente considerados como accesorios y necesarios o apropiados para llevar a cabo los fines que están propiamente comprendidos dentro del asunto general. Una ley puede contener muchas disposiciones y detalles para llevar a cabo el fin legislativo, y si los mismos tienden de una manera legítima a efectuar ese fin la ley 'no es contraria a la disposición constitucional." Id. 846.

La Ley núm. 49 de 1935 que se dictó para regular las horas de trabajo de ciertos empleados establece preceptos de carácter prohibitivo. Esos preceptos requieren sanción penal que no está en conflicto con la letra ni con el espíritu de la ley, ni puede tenerse como materia distinta de la enunciada en su título, si que más bien como accesoria o necesaria para llevar a cabo los fines propiamente comprendidos dentro del asunto en general.

*No existiendo, pues, ninguno de los motivos de inconstitucionalidad alegados, debe declararse el recurso sin lugar y confirmarse la sentencia recurrida.*

Los Jueces Asociados Señores Wolf y Córdova Dávila no intervinieron.