# STATE OF NORTH DAKOTA EX REL. SVEINBJORN JOHNSON, Attorney General, Respondent, v. HUGHES ELECTRIC COMPANY, a Corporation, Appellant.

(199 N. W. 128.)

**Master and servant — clerical error by workmen's compensation bureau held not to invalidate premium notice and pay-in-order.**

1. A clerical error by the workmen's compensation bureau in its premium notice and pay-in-order whereby an employer was charged at a higher rate on employees in its steam heating industry than the bureau's published or manual rate does not invalidate such notice and order, nor does it relieve such employer from paying the manual or fixed rate for that industry.

**Master and servant—workmen's compensation bureau must follow legislature's directions in fixing premium rates.**

2. In enacting a workmen's compensation law the legislature may refrain from classifying employments and determining hazards to workmen engaged therein, and from fixing rates and premiums for insurance, leaving such details to an administrative board under proper rules and directions; in performing its duties such administrative agency must follow the rules and direction of the legislature to give validity to its acts.

**Master and servant — ascertaining of exactly correct premium rates held not required in first instance under workmen's compensation law.**

3. Under the first paragraph of § 7 of chap. 162, Laws 1919, the North Dakota workmen's compensation bureau was not required to ascertain an exactly correct rate for any industry in the first instance; it obeyed the legislative command by employing a competent and experienced actuary to

---

Note.—(6) Constitutionality of Workmen's Compensation Statutes, see notes in 34 L.R.A.(N.S.) 162; 37 L.R.A.(N.S.) 466; L.R.A.1916A, 409; L.R.A.1917D, 51; 28 R. C. L. 745; 3 R. C. L. Supp. 1591; 4 R. C. L. Supp. 1844; 5 R. C. L. Supp. 1559.

assist in computing rates based largely on industrial experience elsewhere in the absence of any general North· Dakota experience and by fixing premiums, in view of its information, experience and the statistics available here and elsewhere, sufficiently high to pay bureau expenses, to pay legitimate claims and to create the surplus provided by law.

**Master and servant — original premium rates fixed by compensation bureau not held unreasonable because higher than necessary.**

4. In view of the legislative command that it fix rates sufficiently high to pay its expenditures, to pay compensation claims "and for the maintenance of adequate reserves and surplus . . . to the end that such fund may be kept at all times in an entirely solvent condition," the original rates of premiums fixed by the North Dakota workmen's compensation bureau, not being shown to be confiscatory, will not be held unreasonable even though it may have developed that such rates were higher than necessary and that they have created a somewhat greater surplus than the percentages of receipt directed by the statute, since it appears that the bureau has obeyed the further statutory mandate "*ultimately* to fix and maintain for each class of occupation the lowest possible rates" by greatly reducing rates to such industries as its experience showed were rated too high and by establishing a credit merit system through which it gives credits and returns dividends to employers with a favorable or normal experience.

**Master and servant — payment of premiums under workmen's compensation law may not be avoided because former rating was too high.**

5. An employer within the terms of the North Dakota Workmen's Compensation Law (Laws 1919, chap. 162) may not escape payment of premiums on its employees because a former rating on employees of such industry may have created more than the exact surplus directed by the statute, where such employer was never insured under the former rating, and never contributed to any surplus created thereby.

**Constitutional law — rate of premium imposed under workmen's compensation law held not to conflict, as to individual employer, with due process and equal protection clauses of Constitution.**

6. Where the North Dakota Workmen's Compensation Law (Laws 1919, chap. 162), without regard to fault or wrongful act, imposes on employers engaged in hazardous industries enforced contributions, to a state fund out of which employees injured in the course of their employment shall be compensated, such contributions to be based on a classification of employments with respect to the degree of hazard and risk of each classification by an administrative bureau, so as to ultimately fix the lowest possible rate for each class of occupation; and where such bureau fixed the same initial rates, based on a percentage of pay rolls, for all the same class of employees in each group of industries, in proportion to the hazards of each group, without regard to management, equipment, working conditions or fault of the indivi-

dual employer affected and regardless of whether injuries should result to its employees; *held* not an arbitrary or unreasonable exercise of authority by the rate fixing bureau and not to conflict with the due process and equal protection clauses of the State and Federal Constitutions.

**Constitutional law — rate making legislative power; jurisdiction of court where rate of premium fixed by workmen's compensation bureau attacked as unreasonable, stated.**

7. Rate making is a legislative power, not a judicial function. Courts will not review purely discretionary acts of an administrative body in the absence of fraud, bias, discrimination or mistake of law. This court may not fix a reasonable rate, its jurisdiction being only to ascertain whether the rates fixed by the bureau are unreasonable or confiscatory and whether fixed within statutory rules.

**Master and servant — presumption in favor of premium rates fixed by workmen's compensation bureau.**

8. The presumption is that classification of industries and rates of premiums fixed for each by the North Dakota workmen's compensation bureau are valid and fixed in conformity to the statute; such presumption is not conclusive but one attacking such classification or rates must clearly show them not to conform to the statutory rules or that they are unreasonable or confiscatory.

Opinion filed May 3, 1924.

Constitutional Law, 12 C. J. § 329 p. 845 n. 60, p. 846 n. 73; § 392 p. 893 n. 92, 93. Workmen's Compensation Acts, C. J. § 174 p. 145 n. 58, 58 New.

Appeal from a judgment in the District Court of Burleigh County, *Coffey*, J.

Action by the State to recover certain insurance premiums claimed to be due to the workmen's compensation fund. Judgment for plaintiff.

Affirmed.

*O'Hare & Cox*, for appellants.

The act in question recites that it is enacted under the police power of the state. The act has been sustained as a constitutional enactment under such power by this court. See State ex rel. Amerland v. Hagen, 175 N. W. 372.

It is a settled rule that where the legislature has decreed that a business or enterprise or industry or a phase thereof is of such a nature that it may be said to be charged with a public interest and thus amenable to strict regulation and control through legislative

enactment, the legislature must prescribe and lay down the rules which are to control the business, industry or employment as the case may be, although the details in connection with the administration of such rules may be left to an administrative body.  12 C. J. 844.

It is not constitutional to delegate a legislative act to a board or commission, therefore it has become the policy of legislatures in the passage of Workmen's Compensation Acts and acts affecting kindred subjects to lay down more or less specific rules regarding the fixation of rates of insurance, minimum hours of employment, etc., and to direct the administrative body charged with the details to be performed under the act to ascertain facts and fix and determine such matters in accordance therewith.  Compare Prentis v. Atlantic Coast Line R. Co. 211 U. S. 210, 53 L. ed. 150, 29 Sup. Ct. Rep. 67; Wichita R. & Light Co. v. Public Utility Commission, 260 U. S. 48, 67 L. ed. 124.

"Moreover it accords with general principles of constitutional government. The maxim that a legislature may not delegate legislative power has some qualifications, as in the creation of municipalities, and also in the creation of administrative boards to apply to the myriad details of rate schedules the regulatory police power of the state. The latter qualification is made necessary in order that the legislative power may be effectively exercised. In creating such an administrative agency, the legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined, and show a substantial compliance therewith, to give validity to its action. When, therefore, such an administrative agency is required, as a condition precedent to an order, to make a finding of facts, the validity of the order must rest upon the needed finding. If it is lacking, the order is ineffective." Wichita R. & Light Co. v. Public Utility Commission, 260 U. S. 48, 67 L. ed. 124; 6 R. C. L. 166; State v. Budge, 14 N. D. 532; 12 C. J. 839, 844, 845; St. Charles State Bank v. Wingfield, 155 N. W. 778.

. *Geo. F. Shafer*, Attorney General, and *Philip Elliott*, for respondent.

"If the law in question is to consummate the beneficent purpose

for which it was intended, the first requisite, so far as the insurance feature is concerned is to take every precaution within the power of the commission to protect the fund from which compensation is to be paid." Scranton Leasing Co. v. Industrial Com. 51 Utah, 368.

"For a popular legislature that meets only once in two years, and then only for sixty days, to attempt to fix rates, would result only in the most ill-advised and haphazard action, productive of the greatest inconvenience and injustice alike to the railways and the public. If such a power is to be exercised at all, it can only be satisfactorily done by a board or commission, constantly in session, whose time is exclusively given to the subject." 38 Minn. 301.

"In reviewing the order of the railroad commission the inquiry is not whether the rate, regulation, or service fixed by the Commission is just and reasonable, but whether the order of the Commission is unreasonable or unlawful. The nature of the inquiry is changed at this point, and the court is not investigating for the purpose of establishing a fixed point. It is quite a different question from that which was before the commission in this respect. The order being found by the court to be such that reasonable men might well differ with respect to its correctness cannot be said to be unreasonable." M. St. P. & S. S. M. R. Co. v. Ry. Comm. 136 Wis. 165.

BUTTZ, District J. The defendant is a corporation engaged in the production and sale of electricity for heat, light and power and steam for heating, with its plant located at Bismarck, North Dakota. This action is brought by the state to recover under the Workmen's Compensation Act Laws 1919, chap. 162; Special Session 1919, chap. 73; Laws 1921, chaps. 141–145 certain sums claimed to be due to the workmen's compensation fund for insurance premiums due to the fund for the year 1921–22. Such premiums, under the law, are based on a percentage of the annual pay roll of the employer. This law was enacted under the police power of the state and by this court has been held a constitutional enactment under such power. State ex rel. Amerland v. Hagan, 44 N. D. 306, 175 N. W. 372. The premium fixed by the workmen's compensation bureau was $4.65 per hundred dollars of pay roll for the electric light and power industry, twenty cents per hundred dollars of office pay roll and in steam heating $4.20 per hun-

dred dollars of pay roll. These were the rates demanded from defendant, except that through a clerical error the defendant was given a rate of $8.90 on its steam heating pay roll, making the bureau's demand in that respect $84.60 too much. Although such sum was not demanded by the bureau in its pay-in-order, the plaintiff sues in its amended complaint for an additional 24 per cent. as an initial rating charge; this charge was a conditional one fixed by the bureau in the initial rating of each concern to be refunded in whole or in part or not at all, at the end of the year, depending upon the accident experience of the particular employer during the first year of insurance with the bureau. It was a part of the system adopted by the bureau to give merit credit through lower rates to employers having a favorable experience and to charge in the future a higher rate to those whose experience was unfavorable. The district court gave plaintiff judgment for the amount sued for, except an allowance was made to correct the clerical error on steam heating rates, and the twenty-four per cent. initial rating charge was not allowed.

The defendant appeals. In its answer it presents many constitutional questions but on this appeal bottoms its defense on two general propositions,—(1) that the premium notice having incorrectly rated defendant's employee engaged in the steam heating industry made that notice null and void, and (2) that the rates fixed by the bureau as applicable to defendant's pay roll were not fixed and determined in accordance with the rules laid down by the legislature as found in chap. 162, Laws 1919.

1. We note at the outset that the twenty-four per cent. initial rating was not included in defendant's premium notice, that that was claimed only in the amended complaint, that the trial court refused to allow it and the bureau did not appeal from that action. It is undisputed that the premium notice and the pay-in-order incorrectly rated defendant on its pay roll for employees engaged in the steam heating industry. The rate fixed by the bureau manual on such pay rolls, and the rate intended to be charged, was $4.20 per hundred dollars while the premium notice demanded $8.90 per hundred dollars. It appears that this excessive rate on a small portion of defendant's pay roll was not purposely claimed in the notice; through a clerical error the rate for

sewer-diggers, a more hazardous employment, was supplied instead of the rate fixed for the steam heating industry.

The defendant standing on what it deems its strict legal rights refused to pay anything contending this error voided the notice and order, even assuming the published manual rate was legally fixed and determined. We find no merit in this contention. No complaint was made to the Bureau about the erroneous rating, no offer was made to pay the manual rate nor was any correction asked. Mr. Hughes, the executive officer and manager of defendant, testified he would refuse to pay the premium even though the steam heating rate given his company had been the manual rate. A published rule of the bureau provides that premiums shall be paid in accordance with the bureau's "settlement sheets as rendered and if any overcharge should exist due credit will promptly be given . . . ." It is the intention of this law that employees and their dependents shall not be deprived of its protection by technicalities. Bordson v. North Dakota Workmen's Comp. Bureau, 49 N. D. 534, 191 N. W. 839. It is fundamental that a mere clerical error will not permit defendant to avoid its liability.

2. Were the rates which the bureau sought to apply to defendant's pay roll determined according to the rules formulated by the legislature?

The defendant concedes the act to be constitutional, it does not criticize the rates of indemnity paid to the injured or his dependents in case of the death of the injured workman, it does not challenge the manner of the distribution of the burden placed on industry as a whole, it does not deny the right of the legislature to give to an administrative body the power to fix such rates within proper rules to be laid down in that authority nor the right of such bureau, within such rules, to fix rates. But it contends that in fixing the rates provided in the manual for its industries the bureau did not act within nor comply with the rules prescribed by the statute in this, "That the rates fixed by the bureau for the industry in which the defendant is engaged are illegal and unreasonable and not based upon the hazard to which the defendant's employees are subject on account of their employment."

The law in question provides for a state fund to be gathered through

enforced contributions · from all employees in hazardous employ-
ments regardless of fault; it binds both employer and employee and
the fund is a source of compensation to injured employees, and, in the
event of their death, to their dependents.   All causes of action for such
injuries are abolished and courts deprived of jurisdiction, save in a
few excepted cases.   No option is given an employer to obtain insurance
elsewhere or to carry it himself.   The bureau is given exclusive rate
making power.   See Fahler v. Minot, 49 N. D. 960, 194 N. W. 695.

That in delegating powers to an administrative board to fix rates,
to supervise working conditions, to prescribe maximum hours of em-
ployment and the like, the legislature must lay down the rules which
shall govern that body in the performance of its duty and that the ad-
ministrative board must obey the legislative command and direction,
is well settled.   12 C. J. 844; Wichita R. & Light Co. v. Public Utili-
ties Commission, 260 U. S. 48, 67 L. ed. 124, 43 Sup. Ct. Rep. 51.

The defendant is content with the rules so prescribed and in its
brief says the statute "has laid down specific rules for the bureau to
follow and has directed that ` . . . these rules shall be used as a
guide or measuring stick," but insists there was a total failure to
comply with such directions.   These rules and directions are contained
in that portion of chap. 162, Laws 1919, which reads:

"Sec. 7. The workmen's compensation bureau shall classify em-
ployments with respect to their degree of hazard and shall determine
the risks of the different classifications and shall fix the rates of pre-
mium for each of said classifications sufficiently high to provide for
the payment of the expenditures of the bureau, the payment of com-
pensation according to the schedules established by this act and for
the maintenance of adequate reserves and surplus by the North Dakota
workmen's compensation fund *to the end that such fund may be kept at
all times in an entirely solvent condition.*

"It shall be the duty of the workmen's compensation bureau, in the
exercise of the powers and discretion conferred upon it, *ultimately to
fix and maintain,* for each class of occupation, the lowest possible rates
of premium consistent with the payment of the expenditures of the
bureau, the maintenance of a solvent compensation fund and the crea-
tion and maintenance of a reasonable surplus, after the payment of
legitimate claims for injury and death that it may authorize to be paid

from the North Dakota Workmen's Compensation Fund for the benefit of injured and the dependents of deceased employees, and, in order that said object may be accomplished, the bureau shall observe the following requirements in classifying occupations and fixing the rates of premium for the risks of the same:

"It shall keep an accurate account of the money paid in premiums by each of the several classes of occupations or industries, and the disbursement on account of injuries and death of employees thereof, and it shall also keep an account of the money received from each individual employer and the amount disbursed from the Workmen's Compensation Fund on account of injuries and death of the employees of such employer." (Italics are ours.)

Ten per cent of the money paid in is to be set aside as a surplus until fifty thousand dollars be accumulated and thereafter five per cent. of the money paid in is to be credited to such fund so long as necessary in the judgment of the bureau to guarantee the fund from year to year. Thus these statutory rules provide that the bureau shall (1) classify employments (2) with respect to hazard and determine the risks of each classification and (3) fix premiums high enough to pay administrative expenses, pay scheduled compensation and create a surplus; and the bureau is commanded (4) to make its rates sufficiently high to at all times keep its fund "in an entirely solvent condition." Such is the foundation which the legislature commanded the bureau to build. *Ultimately* it was intended to fix the lowest rates which its accumulated experience might prove possible and to that end the bureau was commanded to keep an account of income and disbursements on account of each industry and likewise with each individual employer.

The defendant insists that there was inadequate inquiry, study and examination of individual plants by the members of the bureau and its employees in classifying industries, determining hazards and fixing rates; that the actuary employed to formulate the original rates had had no North Dakota industrial experience and made but very slight general investigation of conditions here; that neither the bureau members nor their actuary "ever made an examination or investigation of defendant's plant and had no specific information" as to the hazards to employees therein; that this constituted a failure to comply with the

rules laid down by the legislature, resulted in too high a rate for its particular plant and that the bureau's original ratings created too great a general surplus. All electric lighting plants were placed in one class with the same rate. Defendant offered testimony to show that in its plant employees worked shorter hours than those in other plants; that its management and supervision was better; that its employees had remained for long terms, were more experienced, responsible and reliable than others in similar lines of work; that its plant was of modern construction containing many features making it a much less hazardous place in which to work than similar plants in this state and that its individual experience covering twenty-seven years justified to it a much lower rate than that established by the bureau.

The act was approved by the governor as an emergency measure March 5, 1919. The bureau was required to organize so as to function fully July 1, 1919. North Dakota is young industrially; this newly established bureau had had no experience of its own. An actuary was employed to aid the bureau in classifying industries and fixing rates. He came from the great industrial state of Ohio,—a state with the largest state managed fund in the country. He had computed the rates for workmen's compensation in that state since the passage of its Workmen's Compensation Law. He had available great masses of statistics and information on industrial hazards in other states. Confronted with the legislative command and necessity of providing a fund that should be "at all times in an entirely solvent condition" he computed the electrical plant rate at $7.96 per hundred dollars of payroll. That was in 1919. Defendant was never insured under that rate. It was reduced to $7.75 in 1920. In 1921, when the bureau attempted to bring defendant under the law, this rate, in view of North Dakota experience, had been reduced to $4.65. The last rate was all that defendant was ever asked to pay on its employees in the electrical portion of its industry. There had also been reductions on steam heating and office payrolls. It was, of course, beyond human power for any one to fix an exactly correct rate for this state in advance of experience,—nor more than approximately so with experience. The drastic cut in this rate would indicate the bureau was endeavoring to obey the legislative mandate *"ultimately* to fix and maintain . . . the lowest possible rates" for this industry. The very wording of the law con-

templates the collection in the first instance of something more than merely enough,—just as it contemplates an *ultimate* adjustment of any overcharge. The record discloses that in Minnesota the rate for electric light and power companies is $6.49, steam heating and laying mains $3.15 and office payrolls for electric light companies seven cents, and that North Dakota pays a higher scale of benefits than Minnesota. The rate determining body in Minnesota is a member of the national council of workmen's compensation insurance composed of the representatives of between twenty-five and forty state bureaus. The national council gathers statistics of losses and payrolls in all the states. These losses and payrolls are tabulated and upon the ratio of losses to payrolls Minnesota and other members compute their rates, depending on the scale of benefits in the different states. So it appears that the North Dakota rate is lower than the Minnesota rate and is lower than the National Council experience data warrants.

And here we may make an observation on defendant's claim that the accumulation of a surplus in the fund in excess of the 10 per cent and 5 per cent provisions of the law is conclusive evidence of the violation of the statutory rules. The surplus is somewhat larger than enough to meet the bureau's present and probable accumulated future liabilities plus the additional percentages allowed by the law, though it is not nearly so large as defendant contends. What has already been said on the establishment of rates applies as well to the matter of surplus. But we believe defendant is concluded by the fact that it was sued for the reduced rates and there is no evidence that these rates are producing any surplus. Nor can we conceive any righteous complaint to be made by defendant because of the creation by a former high rate of a surplus in a fund to which it has never contributed but from which it and its employees may reap benefit equally with those whose contributions established it. In that respect it is indeed fortunate. Not having been required to contribute to that surplus its existence is not a matter of complaint for this defendant. Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 544, 58 L. ed. 713, 719, 34 Sup. Ct. Rep. 359; Mountain Timber Co. v. Washington, 243 U. S. 219, 242, 61 L. ed. 685, 698, 37 Sup. Ct. Rep. 260, Ann. Cas. 1917D, 642, 13 N. C. C. A. 927. The evidence shows that the original rates have

been quite generally reduced, that the surplus accumulated has permitted reductions favorable to new participants in the fund.

But even though the premium charges as a whole fixed by the bureau for the industries of this state may not be too great, defendant contends an unfair portion of the burden is imposed on it because defendant's favorable accident experience, its careful supervision, its working conditions and plant equipment were not considered in determining hazards to its employees and in fixing rates applicable thereto. The intent of the law is to impose liability without fault. Fahler v. Minot, 49 N. D. 960, 194 N. W. 695. In Mountain Timber Co. v. Washington, 243 U. S. 219, 244, 61 L. ed. 685, 699, 37 Sup. Ct. Rep. 260, Ann. Cas. 1917D, 642, 13 N. C. C. A. 927, cited supra, the Supreme Court of the United States in considering the Washington Compensation Act, which is almost identical with ours, says on this very question:

"To the criticism that carefully managed plants are in effect required to contribute to make good the losses arising through the negligence of their competitors, it is sufficient to say that the act recognizes that no management, however careful, can afford immunity from personal injuries to employees in the hazardous occupations, and prescribes that negligence is not to be determinative of the question of the responsibility of the employer or the industry. Taking the fact that accidental injuries are inevitable, in connection with the impossibility of foreseeing when, or in what particular plant or industry, they will occur, we deem that the state acted within its power in declaring that no employer should conduct such an industry without making stated and fairly apportioned contributions adequate to maintain a public fund for indemnifying injured employees and the dependents of those killed, irrespective of the particular plant in which the accident might happen to occur. In short, it cannot be deemed arbitrary or unreasonable for the state, instead of imposing upon the particular employer entire responsibility for losses occurring in his own plant or work, to impose the burden upon the industry through a system of occupation taxes limited to the actual losses occurring in the respective classes of occupations."

But it seems to us the defendant is borrowing trouble from surveying the past. There has at all times existed the statutory command as

to *ultimate* rates; whatever may be said regarding the original rates, defendant was never affected by them, and before it was required to come under the bureau the rates affecting its industries were radically lowered. A credit merit system was introduced and large credits and dividends were actually paid for favorable or normal experience to eighty-eight per cent of the contributing employers. So good management, modernized plants, well maintained equipment and favorable accident experience are being recognized, adjusted and compensated.

The legislature has empowered an administrative body, not the courts, to classify industries and fix premiums. Much must necessarily be left to the judgment and discretion of the body of specialists provided by the legislature to carry out its intent and purpose.

The presumption is that the rates in question are valid and that they were fixed by the bureau in conformity with the statute. Such presumption exists whether declared by statute or not. The order of the bureau carries with it the same presumption of its correctness as though the rates were fixed by statute. One attacking the order must produce evidence clearly showing that it was not promulgated in conformity to the statutory rules or that it is unreasonable or confiscatory. But the presumption is not a conclusive presumption. To attempt to so make it would be to violate the due process clause of the Federal and State Constitutions. State ex rel. Hopkins v. Southwestern Bell Teleph. Co. 115 Kan. 236, 223 Pac. 775. Neither this court nor the trial court may substitute its judgment for that of the bureau as to what is a reasonable rate or just premium. To do so would be to assume legislative power, not to perform a judicial function. San Diego Land & Town Co. v. Naional City, 174 U. S. 754, 43 L. ed. 1160, 19 Sup. Ct. Rep. 804; Prentis v. Atlantic Coast Line Co. 211 U. S. 210, 53 L. ed. 150, 29 Sup. Ct. Rep. 67. We are charged only with ascertaining whether the bureau in performing its duty violated any legislative rule enacted for its guidance and whether the rates fixed by it are unreasonable or confiscatory,—a thing vastly different from fixing a reasonable rate, which is always for the bureau. Minneapolis, St. P. & S. Ste. M. R. Co. v. Railroad Commission, 136 Wis. 146, 17 L.R.A.(N.S.) 821, 116 N. W. 905. We are satisfied the bureau in fixing the rates complained of acted within the legislative direction, that there is no preponderance of the evidence against the

finding of the trial court that these rates are not unreasonable or con-
fiscatory. "It is enough if we cannot say that it was impossible for
a fair-minded board to come to the result which was reached." San
Diego Land & Town Co. v. Jasper, 189 U. S. 439, 441, 47 L. ed.
892, 894, 23 Sup. Ct. Rep. 571.

The judgment is affirmed.

BRONSON, Ch. J., and NUESSLE, BIRDZELL, and CHRISTIANSON, JJ.,
concur.

JOHNSON, J., being disqualified, did not participate in this decision;
C. W. BUTTZ, Judge of the Second Judicial District Court, sitting in
his stead.