Sucesión de Vicente Rodríguez, peticionaria, *v.* La Comisión Industrial de Puerto Rico, demandada.

Núm. 32.—*Sometido:* Mayo 9, 1938. *Resuelto:* Noviembre 9, 1938.

*Leopoldo Tormes García,* abogado de la peticionaria; *M. León Parra* y *Luis Negrón Fernández,* abogados de la Comisión Industrial y del Fondo del Seguro del Estado, respectivamente; *E. J. Fonfrías,* abogado de los beneficiarios.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

El presente es un recurso de revisión interpuesto por la Sucesión de Vicente Rodríguez contra la resolución de la Comisión Industrial de Puerto Rico de febrero 4 último por virtud de la cual se decidió:

"*Primero:* que Santiago Guzmán era un obrero al servicio del patrono Sucesión Vicente Rodríguez para la fecha en que sufrió el accidente; *Segundo:* que Santiago Guzmán sufrió un accidente mientras trabajaba a jornal para el patrono Sucesión Vicente Rodríguez que le provino de un acto o función inherente a su trabajo y le ocurrió en el curso de éste y como consecuencia del mismo cuyo accidente es la causa que le privó de la vida, por lo cual tiene derecho a toda la protección que provee la Ley 45 de abril 18 de 1935; *Tercero:* que el patrono Sucesión Vicente Rodríguez empleaba más de cuatro obreros para la fecha del accidente ocurrídole a Santiago

Guzmán y que no estaba asegurado en el Fondo del Seguro del Estado en violación de lo dispuesto por la Ley 45 de abril 18 de 1935, y por lo tanto dicho patrono es responsable en este caso del accidente.''

Pidió reconsideración la parte perjudicada y la Comisión la negó por resolución de febrero 15, 1938, y fué entonces que dicha parte, en tiempo y forma, estableció ante esta Corte Suprema el recurso que autoriza el artículo 11 de la Ley Núm. 45 de 1935, para proveer el bienestar de los habitantes . . . . Leyes de 1935, pág. 289.

El recurso se funda en nueve motivos. Por los cinco primeros se ataca la constitucionalidad de la ley en cuanto a la creación de la Comisión Industrial y del Fondo del Seguro del Estado, sosteniéndose, 1, que la Comisión no tuvo jurisdicción para conocer de este asunto de naturaleza judicial por ser un organismo separado del Departamento de Justicia y establecido en contravención del artículo 37 de la Ley Orgánica; 2, que dicha Comisión se constituyó de hecho para actuar como un nuevo Departamento Ejecutivo del Gobierno Insular en contravención del mismo artículo 37 de la Ley Orgánica; 3, que el Fondo del Seguro del Estado y su Administrador creados de igual modo para funcionar independientemente del Departamento del Tesoro, lo fueron en contra de la Carta Orgánica; 4, que la Ley Núm. 45 de 1935 creadora de la Comisión y del Fondo, tiende a privar de sus bienes a los ciudadanos sin el debido proceso de ley, y 5, que dicha ley contiene una ilegal delegación de poderes.

La primera cuestión que surge al considerar estos motivos es la de si la peticionaria está o no impedida por sus propios actos de alegarlos.

Se dice en 71 C. J. 303, citando el caso de *Battle Creek Coal and Coke Co.* v. *Martin*, 290 S. W. 18, 155 Tenn. 34, que un patrono ''que se somete sin objeción a la jurisdicción de la Comisión Industrial, renuncia a su derecho a insistir que el estatuto que pretende conferir tal jurisdicción invadía sus derechos constitucionales.''

Sin embargo, habiéndose puesto en tela de juicio la constitucionalidad de la ley y habiéndose presentado argumentos demostrativos de un extenso estudio del problema, el interés público requiere que la situación se despeje lo antes posible a los efectos de la estabilidad de nuestras instituciones.

La resolución del asunto de que se trata envolvió en verdad por parte de la Comisión Industrial el estudio de alegaciones, la práctica de prueba y el peso de la misma y la aplicación de preceptos legales y jurisprudencia que requieren el ejercicio del poder que de acuerdo con nuestro sistema de gobierno reside en las cortes de justicia. De ahí que dicho organismo haya sido considerado como uno de naturaleza cuasi judicial. Pero tal circunstancia, por sí sola, no implica la anticonstitucionalidad de la Comisión porque si bien ello es así, la propia ley que la crea otorga un recurso para ante las cortes de justicia reservando a éstas de tal modo la última palabra en el ejercicio del poder.

Recientemente esta propia Corte Suprema en *Montaner v. Comisión Industrial,* 52 D.P.R. 924, 928, dijo:

"El legislador, como poder regulador de la organización por él creada para el funcionamiento y aplicación de la ley de compensaciones por accidentes del trabajo, creó la Comisión Industrial y la invistió de facultades cuasi judiciales y cuasi tutelares, para que fuera ella y no los tribunales de justicia ordinarios la encargada de dirimir en primera instancia las contiendas que pudiesen surgir entre el Administrador, como funcionario ejecutivo, y los obreros lesionados o sus beneficiarios con respecto a la compensación a que éstos pudiesen tener derecho."

Y poco antes, en *Caraballo* v. *Comisión Industrial,* 51 D.P.R. 161, 163, había dicho "que la Comisión Industrial es un cuerpo cuasi judicial con plena facultad para resolver todas las cuestiones de derecho y de hecho que sean llevadas ante ella debidamente."

El establecimiento de comisiones o juntas de esa naturaleza se ha impuesto por lo complicado e intenso de la vida, por la necesidad de la especialización y por la rapidez y

uniformidad requeridas en la solución de las cuestiones que a ellas se encomiendan. Como se indica por William R. Schneider, a la página 60 del volumen primero de su obra sobre "The Law of Workmen's Compensation", su establecimiento no viola el precepto "constitucional que no se establecerán otras cortes que las provistas por la constitución, ya que la junta no es una corte y se dan amplias facultades para la revisión por las cortes."

La creación y el funcionamiento por años de organismos similares a nuestra Comisión Industrial en los estados y territorios de la Unión, sin chocar con la Constitución, es tan patente, que no ha de ser nuestra isla una excepción, especialmente cuando nuestra Ley Orgánica no contiene precepto alguno que a ello se oponga. Al contrario, de su contexto general, de sus disposiciones especiales y de la interpretación que la propia Corte Suprema de los Estados Unidos ha dado a la clase de gobierno establecido por el Congreso en la Isla, se ve que en sus principios fundamentales y orientaciones es el mismo que rige en el continente.

En *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 261, dijo hace unos meses la Corte Suprema de los Estados Unidos por medio del Juez Sutherland:

"El propósito de la Ley Foraker y del Acta Orgánica era dar a Puerto Rico entero poder local para que pudiera resolver por sí mismo, con una autonomía similar a la de los estados y territorios incorporados. *Gromer* v. *Standard Dredging Co.*, 224 U. S. 362, 370; *Porto Rico* v. *Rosaly y Castillo*, supra, pág. 274. El efecto fué conferir a los territorios muchos de los atributos de cuasi soberanía poseídos por los estados, como por ejemplo inmunidad a ser demandados sin su consentimiento. *Porto Rico* v. *Rosaly y Castillo*, supra. A través de esos actos se erigió la estructura gubernamental típicamente americana, que consiste de tres departamentos independientes —legislativo, ejecutivo y judicial. 'Un cuerpo político'—un estado— fué creado. 31 Stat. 79, sección 7, c. 191. El poder para imponer contribuciones, el poder para aprobar y ejecutar las leyes, y otros poderes característicos de un gobierno le fueron entregados. Y en lo que respecta a cuestiones locales, como ya hemos demostrado res-

pecto a territorios continentales, se le confirieron poderes legislativos casi, si no tan amplios como los que ejercitan las legislaturas estaduales.''

Parece oportuno citar también lo que sobre la materia se dice en Willoughby, Constitutional Law, pág. 705 de la edición de 1930:

''Se notará que la doctrina que aquí se establece es con referencia a materias que envuelvan 'derechos públicos'. Por tanto un estatuto sería, sin duda, inconstitucional si tratara de poner en manos administrativas la determinación final de controversias entre personas particulares. Sin embargo, como se verá más tarde, especialmente en relación con la responsabilidad de los patronos y las leyes de compensación a obreros, pueden alterarse por medio de legislación los derechos y responsabilidades reconocidos por la ley común, y aun pueden éstos abolirse siempre que se les sustituya por otros remedios o defensas administrativas adecuadas. El efecto de tal sustitución es, por supuesto, evitar la acción judicial en relación con clases de casos *in totum* que, antes de tal legislación, podían ser vistos por las cortes, y facultar a las agencias administrativas para conceder tales remedios o imponer tales responsabilidades como se reconocen y se estipulan en las leyes.''

No es, pues, la Comisión Industrial de Puerto Rico un organismo anticonstitucional por el hecho de actuar en forma cuasi judicial sin ser una corte de justicia, y tuvo, a nuestro juicio, plena jurisdicción para resolver el asunto de que se trata.

Tampoco constituye la Comisión, a nuestro juicio, un Departamento Ejecutivo separado del Gobierno Insular, no siendo su creación contraria al artículo 37 de la Ley Orgánica. Igual puede decirse con respecto al Fondo del Seguro del Estado. A esas conclusiones llegamos tras un estudio detenido de la organización y funcionamiento de ambos.

''No se creará por la Asamblea Legislativa ningún departamento ejecutivo no provisto por esta Ley; pero la Asamblea Legislativa podrá consolidar departamentos, o suprimir cualquier departamento, con el consentimiento del Presidente de los Estados Unidos'', ordena el párrafo se-

gundo del artículo 37 de la Carta Orgánica. De suerte que si de la creación de un departamento independiente se tratara, tendría razón la recurrente, pero ya hemos dicho que, a nuestro juicio, no es así.

La Ley Núm. 45 de 1935 lo fué como lo expresa su título para promover el bienestar de los habitantes de Puerto Rico en lo que respecta a accidentes que causen la muerte o lesiones o enfermedades de los trabajadores en el curso de su empleo, y el poder de nuestra Legislatura para decretar esa clase de leyes fué enfáticamente reconocido en el párrafo diez del segundo artículo de la propia Carta Orgánica, en los siguientes términos:

"Nada de lo contenido en esta Ley será interpretado en el sentido de limitar la facultad de la Asamblea Legislativa para decretar leyes para la protección de la vida, salud y seguridad de empleados y obreros."

Usando de sus facultades nuestra Legislatura ha venido decretando leyes de compensaciones por accidentes del trabajo. Refiriéndonos a la Núm. 45 de 1935 que es la que se impugna, encontramos mencionado desde su primer artículo el Fondo del Seguro del Estado. En el tres se nombra la Comisión Industrial a la que se dice que el obrero o empleado podrá apelar de cierta clase de resoluciones del Administrador del Fondo del Estado.

Fija luego la ley las incapacidades y las compensaciones, etc., y organiza en su artículo sexto la "oficina del Administrador del Fondo del Estado que por la presente se crea, en el Departamento de Hacienda, y la cual tendrá a su cargo los siguientes deberes y funciones:"

Los especifica y seguidamente dispone: "Una Comisión que por la presente se crea, en el Departamento del Trabajo, se denominará 'Comisión Industrial de Puerto Rico' la que constará de tres comisionados, nombrados por el Gobernador, con el consejo y consentimiento del Senado, . . . "

Y continúa la ley en forma detallada regulando el funcionamiento de la Comisión y del Fondo. No hay duda alguna que les da la independencia de acción que toda buena organización requiere a los fines de poder exigírsele la consiguiente responsabilidad, pero los adscribe expresamente a dos de los Departamentos Ejecutivos del Gobierno Insular, al del Trabajo la Comisión y al de Hacienda el Fondo, de acuerdo con el propio campo de acción de cada uno, pudiendo encontrarse a través de los otros artículos de la ley las conexiones de dichos organismos con sus respectivos Departamentos.

El hecho de que tanto el Fondo como la Comisión puedan ejercitar con independencia las facultades que la ley les confiere, sin intervención del Tesorero ni del Comisionado del Trabajo, respectivamente, no los convierte en nuevos Departamentos Ejecutivos del Gobierno.

Cuando se piensa en este motivo de la creación de nuevos departamentos ejecutivos a virtud de la organización de la Comisión y el Fondo para rendir el servicio de seguridad social que se les encomendara, a los efectos de impugnar la constitucionalidad de su organización, se comprende bien lo que dice Corpus Juris al comenzar a extraer la sustancia de la jurisprudencia sobre la constitucionalidad y validez de esta clase de estatutos. Es así:

"Como era de esperarse de la nueva, y un tanto revolucionaria, naturaleza de la legislación de compensación (a obreros), la constitucionalidad de los varios estatutos ha sido atacada por fundamentos tan numerosos como se han sugerido a la habilidad, y en ciertas ocasiones a la ingenuidad, del abogado. Se ha dicho en términos generales que la aprobación de leyes de compensación a obreros está dentro de los poderes legislativos del congreso y de los estados; y la prueba general establecida es que las leyes de compensación, para estar dentro de los límites de la constitución, no pueden ser arbitrarias, irrazonables o fundamentalmente injustas u opresivas. Se ha aplicado la regla a las leyes de compensación a obreros, que no serán declaradas inconstitucionales a menos que no se haga aparecer su invalidez más allá de una duda razonable, y se ha decidido

que (esta regla) aplica a estas leyes con fuerza peculiar; las presunciones están en favor de su validez, y el 'onus probandi' descansa sobre la parte que ataca la constitucionalidad del estatuto, y la violación a la constitución tiene que ser clara y sin lugar a dudas antes de que la ley sea declarada inconstitucional; así pues, cuando la ley de compensaciones es susceptible de dos interpretaciones, por una de las cuales sería inconstitucional y por la otra válida, se adoptará la interpretación que favorece su validez, y aún cuando el abogado interprete erróneamente el estatuto, la corte no debe por esa razón declararlo inconstitucional, si la ley, debidamente interpretada, es constitucional.'' 71 C. J. 251.

Para sostener el motivo cuarto o sea que la Ley Núm. 45 de 1935 es inconstitucional porque tiende a privar de sus bienes a los ciudadanos en general y a la recurrente en particular sin el debido proceso de ley, se invoca el carácter compulsorio del estatuto, citándose sus artículos 8 a 10, 15, 18, 19, 23 a 25, 27 y 29, que se refieren al poder de la Comisión y el Fondo para interrogar testigos, celebrar convenios sobre cuantía de las compensaciones, resolver definitivamente conflictos entre obrero y administrador, determinar la compensación que debe pagar el patrono no asegurado a cobrarse por el Tesorero, multar al patrono que teniendo más de cuatro obreros no se asegura, exigir informes sobre nóminas de salarios, tasación e imposición de cuotas e inversión de reservas del Fondo en bonos.

Estudiando esas disposiciones se encuentra que todas están en armonía con el propósito del estatuto y son razonablemente necesarias para rendir el servicio social encomendado al Fondo y a la Comisión de una manera eficiente, y que todas ofrecen a las partes envueltas las debidas garantías de un proceso de ley. Ninguna se ha demostrado que sea de tal modo arbitraria que viole los derechos constitucionales de los ciudadanos. Se limitan a establecer las bases propias para exigir de modo eficaz el cumplimiento de deberes que el reconocimiento y disfrute de aquellos derechos llevan consigo en una sociedad debidamente constituída.

Y la Corte Suprema de los Estados Unidos en *Mountain Timber Co.* v. *State of Washington,* 243 U. S. 219, dijo sosteniendo la validez de una ley de compensaciones compulsoria:

"La autoridad del estado para promulgar leyes razonablemente necesarias para la promoción de la salud, seguridad y bienestar general del pueblo, lleva consigo un amplio criterio y amplia discreción respecto a qué materias son de suficiente importancia general para someterlas a regulación y administración por el estado. (Citas.)

" 'El poder policíaco del estado es tan amplio y plenario como el poder para imponer contribuciones.'

"En *Barbier* v. *Connolly,* 113 U. S. 27, dijo la corte por voz de su juez asociado Sr. Field: 'Ni la enmienda 14—tan amplia y comprensiva como es—ni ninguna otra enmienda, fué designada para intervenir con el poder del estado, algunas veces llamado poder policíaco (*police power*) para prescribir reglamentos para promover la salud, tranquilidad, moral, educación y el buen orden del Pueblo, y para legislar con el propósito de aumentar las industrias del estado, desarrollar sus recursos y añadir a su prosperidad . . . . la materia de compensación por accidentes casuales que resulten en la pérdida de vida o de capacidad para ganar dinero, es de suficiente importancia pública para justificar que toda la materia de compensación se haga de interés público . . . ''

Tampoco es, por último, inconstitucional la ley por el quinto de los motivos alegados, a saber, porque delega poder legislativo en la rama ejecutiva del gobierno, o sea, en el Fondo y la Comisión, en la materia especial de imposición de contribuciones permitiéndoles hacerlo a su arbitrio, sin uniformidad y hasta en forma confiscatoria.

Va demasiado lejos en sus calificaciones la recurrente. Nuestra ley sigue en ese punto precedentes bien establecidos. El Fondo del Estado sujeta su actuación a reglas y principios que aplica de acuerdo con su investigación de los hechos y su actuación puede ser revisada por la Comisión y aun la decisión de ésta por la Corte Suprema. *Montaner* v. *Comisión Industrial,* 53 D.P.R. 183.

En la ya citada obra de Schneider sobre Compensaciones a Obreros, volumen 1, pág. 58, se dice:

"Las disposiciones de la ley que autorizan a las juntas del estado a imponer primas de seguro a los patronos cubiertos por la ley, que participan de la naturaleza de contribuciones indirectas, a cobrar las mismas y a depositarlas en un fondo de seguro del estado, del cual esas juntas pagan la compensación a obreros lesionados, o a sus dependientes, no violan la cláusula de 'due process' de la constitución federal y estadual."

Y en *State* v. *Hughes Electric Co.*, 199 N. W. 128, se decidió que:

"Al aprobar una ley de compensaciones a obreros la Legislatura puede abstenerse de clasificar los empleos y de determinar los riesgos que corren los trabajadores allí empleados, y de fijar la tarifa y premio para el seguro, dejando tales detalles a una junta administrativa que actúe bajo un reglamento y dirección apropiados; y en el desempeño de sus funciones tal agencia administrativa debe seguir las reglas y dirección de la Legislatura, para darle validez a sus actos."

Resolviéndose en *Miller-Todd Coal Co.* v. *State Compensation Com'r.*, 175 S. E. 856 que:

"Somos de opinión que el hecho que específicamente se delegue al comisionado poder para clasificar, reclasificar y crear grupos o clases de industrias adicionales para hacer avalúos (Code 1931, 23–2–4) y para crear y mantener un fondo solvente (Code 1931, 23–2–5) justificaba la promulgación de la regla de que se quejan. Y está bien establecido que no es siempre necesario que estatutos y ordenanzas tracen específicamente un curso de acción. Como se dice en una nota, 12 A.L.R. 1435, 1437, 'algunas situaciones requieren que se delegue cierta discreción a funcionarios públicos, como por ejemplo, cuando es difícil o impracticable establecer una regla definitiva o comprensiva, o la discreción se refiere a la administración de una regla del poder policíaco y es necesaria para proteger la moral, salud o seguridad públicas, y el bienestar general."

Véase *M. Taboada y Co.* v. *Rivera Martínez*, 51 D.P.R. 253, 271.

Decidido que la ley es constitucional, procederemos a examinar y resolver los otros señalamientos de error en que se basa el recurso.

■ Sostiene la peticionaria que la Sucesión de Vicente Rodríguez no es una persona jurídica que pueda demandar y ser demandada, y que aunque lo fuera, no se ha demostrado quiénes la componen, ni que fuera el patrono del obrero fallecido, ni que empleara más de cuatro obreros, ni que Francisco Rodríguez Torres pueda con sus actuaciones obligarla. Imputa pasión, parcialidad y prejuicio a la Comisión al apreciar la evidencia.

El recurso en el que se levantan esas cuestiones se interpuso por la "Sucesión de Vicente Rodríguez" así: "Comparece la peticionaria, supuesto patrono, Sucesión Vicente Rodríguez, por su abogado que suscribe y respetuosamente alega:".

De suerte que la misma entidad que sostiene que no es una persona jurídica que pueda demandar y ser demandada, es la que interpone como tal el recurso, sin especificar quiénes son las personas que la componen.

En tal virtud si se aplicara estrictamente su teoría, debería desestimarse el recurso por no haberse establecido por persona natural o jurídica con capacidad para comparecer ante los tribunales.

Esta corte, hablando por su Presidente Sr. Hernández; desde 1917 se expresó, en el caso de *Arvelo et al.* v. *Banco,* 25 D.P.R. 728, 736, como sigue:

"Los derechos a la sucesión de una persona se transmiten desde el momento de su muerte. Artículo 657 del Código Civil de 1889. La sucesión se defiere por la voluntad del hombre manifestada en testamento, y, a falta de éste, por disposición de la ley. Artículo 658. Los herederos suceden al difunto por el solo hecho de su muerte en todos sus derechos y obligaciones. Artículos 661. Los artículos transcritos concuerdan con los 665, 666 y 669 del Código Civil Revisado.

"La sucesión como persona jurídica no existe en nuestro derecho. Cabe que una sucesión sea parte demandante o demandada; pero para ello es necesario que se particularice e individualice expresando los miembros que la componen. No es una entidad legal independiente de los herederos. Éstos son los que la determinan, y son los que deben aparecer como demandantes o demandados.

"Al resolver el caso de *Dapena* v. *Sucesión Dominicci*, 12 D.P.R. 66, dijo esta corte que cuando la demanda se dirige contra una sucesión, debe expresarse el nombre de cada uno de los herederos o darse alguna razón que justifique la omisión del dicho requisito; y congruente con esa doctrina, al resolver el caso de *Orcasitas* v. *El Registrador*, 21 D.P.R. 553, se expresó en los términos siguientes: 'Estamos de acuerdo con el registrador en que si era necesaria la notificación o citación a la indicada sucesión, debió haberse hecho constar quiénes la componían, con el objeto de que dicho registrador pudiera determinar si dicha notificación fué hecha en forma adecuada.' "

Siendo ello así es claro que en el título de los procedimientos y en la resolución final de la Comisión debieron consignarse los nombres de los componentes de la Sucesión, pero creemos que mostrando como muestra el récord quiénes son los componentes de la Sucesión, el defecto no es fatal, pudiendo la resolución ser corregida debidamente.

Hemos examinado dichos procedimientos y encontramos en efecto que su primer documento es una carta firmada por José Rodríguez dirigida al Presidente de la Comisión que comienza así:

"Señor: Con fecha 26 de julio del corriente año, 1935, el trabajador, Santiago Guzmán, vecino de Guayanilla y domiciliado en el barrio Consejo, de aquella jurisdicción, fué atrapado por un buey que formaba parte de una yunta que el trabajador uncía al yugo a fin de dar comienzo a la faena del día de labrar tierras de la Sucesión Rodríguez, compuesta de los señores Manuel, Francisco y otros, vecinos de Guayanilla con fincas en el barrio Consejo de aquella jurisdicción."

Continúase en los otros documentos hablándose siempre de la Sucesión de Vicente Rodríguez, constando a la página

once la declaración jurada de Francisco Rodríguez, cuyos párrafos 1, 2, 3, 4, 9 y 10 dicen:

"Que soy uno de los miembros que componen la Sucn. Vicente Rodríguez.

"Que la Sucn. Vicente Rodríguez la componen once personas llamadas Ramona Torres, Manuel Rodríguez, Antonio, Dolores, Consuelo, María, Carmen, Virginia, Cándida, Carlos y el que suscribe, todos de apellido Rodríguez.

"Que soy un arrendatario de ambas fincas situadas en el Bo. Consejo y Bo. Jagua de la municipalidad de Guayanilla, propiedad de la Sucn. antes mencionada.

"Que represento la Sucn. y me entiendo en todo lo concerniente a estas propiedades.

"Que debido a que soy uno de los miembros que componen la Sucesión no existe escritura alguna ni documento del arredamiento que se hace referencia, siendo un convenio verbal entre familia aprobado por todos.

"Que en julio 26, 1935 sufrió el obrero Santiago Guzmán un accidente mientras trataba de enyugar uno de los bueyes propiedad del que suscribe para trabajar en la parcela que le había concedido verbalmente, por dos años para cultivarla para su propio beneficio."

Eso en la investigación preliminar. En el récord de la vista pública ante la Comisión se expresa, página 35 de los procedimientos, que comparece "el patrono Sucn. de Vicente Rodríguez en la persona del Sr. Francisco Rodríguez, acompañado de su abogado Lic. Leopoldo Tormes García, ofreciendo el testimonio de . . ." Su defensa, según la expuso su abogado, consistió en que "ni el 26 de julio ni en ninguna otra fecha del año 1935 con anterioridad a ésa, la Sucesión de Vicente Rodríguez no era el patrono de Santiago Guzmán y que Santiago Guzmán era un individuo que tenía un pedazo de terreno por tolerancia, que tenía arrendado Francisco Rodríguez de la Sucesión de Vicente Rodríguez, y que lo que ese terreno producía era para beneficio de Santiago Guzmán, sin que en ninguna forma interviniera para nada en ese pedazo de terreno la Sucesión de Vicente Rodríguez ni Francisco Rodríguez."

█ La parte contraria introdujo de igual modo su evidencia. Toda la practicada fué apreciada por la Comisión, que resolvió el conflicto existente entre la misma en contra de la recurrente. La hemos examinado y no creemos que pueda concluirse que sea de tal manera deficiente que al apreciarla en la forma en que lo hizo la Comisión cometiera un error de derecho que pudiera servir de base a la revisión solicitada. Artículo 11 de la Ley Núm. 45 de 1935, pág. 289.

*Debe, en tal virtud, declararse no haber lugar a la revisión solicitada.*