2004 ND 229

**SPECTRUM CARE, L.L.C., Appellant**

v.

**WORKFORCE SAFETY and INSURANCE, Appellee.**

No. 20040171.

Supreme Court of North Dakota.

Dec. 17, 2004.

Lynn M. Boughey, Boughey Law Firm, Minot, N.D., for appellant.

Lawrence E. King, Special Assistant Attorney General, Zuger Kirmis & Smith, Bismarck, N.D., for appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Spectrum Care, L.L.C., appealed from a judgment affirming a Workforce Safety and Insurance ("WSI") decision classifying Spectrum's employees for purposes of establishing Spectrum's insurance premiums. We conclude WSI's classification of Spectrum's employees is supported by a preponderance of the evidence, and we affirm.

I

[¶ 2] Spectrum operates Somerset Court, an assisted living retirement facility in Minot. About seventy-six residents live in apartments at Somerset Court, and the facility provides meals in a dining room for its residents. According to Kathy Klein, the director at Somerset Court, the residents:

> have to be able to walk themselves down to the dining room. They need to be able to dress themselves for the most part. We do assist with simple items, buttons, shoes, TED hose, things that are difficult with arthritic fingers, things like that. They need to operate pretty much independently within their own apartment area. We're there just to provide services to them, you know, as

far as things that they would like to have, transportation, activities, meals.

Spectrum provides activities for the residents, including "day trips to the park, to the casino .... different activities in the courtyard, Bocchi ball, horseshoe, different things like that .... scavenger hunts, we play cards, we shoot pool, golfing."

[¶ 3] Spectrum is an employer subject to the insurance requirements of N.D.C.C. Title 65, and during the time relevant to this proceeding, employed about thirty-three individuals at Somerset Court, including about sixteen to eighteen "resident service aides" and two "activity aides." After receiving a claim for benefits and conducting a field audit, WSI classified Spectrum's "resident service aides" and "activity aides" as "9040 Hospitals" with a designated composite rate of 1.91 for purposes of establishing Spectrum's insurance premiums. Spectrum requested reconsideration of WSI's decision, claiming its facility provided no health care for its residents and its employees should have been classified either in a different or a new classification. After further meetings and consideration of Spectrum's job descriptions, WSI classified Spectrum's resident services aides and activity aides as "9002 Domestics" with a designated rate of 3.31 for purposes of establishing Spectrum's insurance premiums.

[¶ 4] Spectrum requested and received a formal hearing, after which an administrative law judge recommended affirming WSI's decision regarding resident service aides and recommended that WSI review the duties and activities of Spectrum's activity aides for purposes of establishing insurance premiums for them. WSI adopted the administrative law judge's recommendation, and after Spectrum appealed, the district court affirmed WSI's decision.

II

[¶ 5] Chapter 65–04, N.D.C.C., authorizes WSI to classify employments with regard to their degrees of hazard, to determine the risks of the different classifications, to fix the rate of premium for each classification, and to determine the amount of premium to be paid by each employer. N.D.C.C. §§ 65–04–01 and 65–04–04. *See In re S.A. Healy Co.*, 109 N.W.2d 249, 250 (N.D.1960). Section 65–04–32, N.D.C.C., was enacted in 2001 to provide employers with a procedure to challenge decisions under N.D.C.C. ch. 65–04, and parallels the procedure for challenging claims decisions in N.D.C.C. § 65–01–16. *Hearing on SB 2157 Before Senate Industry, Business, and Labor Comm.*, 57th N.D. Legis. Sess. (Jan. 17, 2001) (written testimony of Julie Leer, General Counsel for WSI). Section 65–04–32, N.D.C.C., outlines the procedures for challenging a WSI decision under N.D.C.C. ch. 65–04, and those procedures include an informal decision by WSI, an employer's right to petition for reconsideration, and a party's right to request a rehearing. Under N.D.C.C. § 65–04–32(5), rehearings must be conducted as hearings under N.D.C.C. ch. 28–32, to the extent that chapter does not conflict with N.D.C.C. § 65–04–32. WSI may request a hearing officer to conduct a rehearing and issue recommended findings, conclusions, and orders. Within sixty days after receiving the administrative law judge's recommendation, WSI must serve the parties with its posthearing administrative order, and an employer may appeal to the district court under N.D.C.C. ch. 65–10. Section 65–10–01, N.D.C.C., authorizes appeals of WSI decisions issued under N.D.C.C. ch. 65–04, and any appeal under that section must be taken in the manner provided by N.D.C.C. ch. 28–32. Those provisions contemplate review of decisions classifying employees

236

for purposes of insurance under the same standard of review for decisions on claims for benefits.

[¶ 6] Under N.D.C.C. §§ 28-32–46 and 28–32–49, the district court, and this Court on further review, must affirm a WSI decision on a claim for benefits if: its findings of fact sufficiently address the evidence and are supported by a preponderance of the evidence; its conclusions of law and order are supported by its findings of fact; its decision is supported by its conclusions of law; its decision is in accordance with the law and does not violate the claimant's constitutional rights; its rules or procedures have not deprived the claimant of a fair hearing; its conclusions of law and order sufficiently explain its rationale for not adopting a contrary recommendation by an administrative law judge; and the provisions of N.D.C.C. ch. 28–32 have been complied with in proceedings before the agency. In reviewing an agency's findings of fact, we do not make independent findings of fact or substitute our judgment for that of the agency. *Elshaug v. Workforce Safety & Ins.*, 2003 ND 177, ¶ 12, 671 N.W.2d 784. Rather, we decide only whether a reasoning mind reasonably could have determined the agency's factual conclusions were supported by the weight of the evidence from the entire record. *Id.* An agency's decision on a question of law, including the interpretation of a statute, is fully reviewable by this Court. *Id.* Our review under those provisions is consistent with the deferential standard that this Court has historically applied to rate decisions by the predecessor to WSI. *See State v. Hughes Elec. Co.*, 51 N.D. 45, 57, 199 N.W. 128, 132 (1924) ("court may not substitute its judgment for that of the bureau as to what is a reasonable rate or just premium"). Moreover, in other contexts, we have specifically observed that we give deference to administrative agencies in complex areas like rate setting. *See St. Benedict's Health Ctr. v. North Dakota Dep't of Human Servs.*, 2004 ND 63, ¶ 9, 677 N.W.2d 202. We apply those principles of deference to our review in this case.

III

[¶ 7] In its appellate brief, Spectrum argues WSI failed to issue a final order in this matter, because WSI's decision required further analysis of the appropriate classification for Spectrum's activity aides. WSI responds that it has completed its classification of activity aides and has supplemented the record accordingly. During oral argument to this Court, Spectrum conceded that issue has been finally resolved and this appeal is properly before us.

IV

[¶ 8] Spectrum argues WSI improperly classified Spectrum's resident service aides. Spectrum argues resident service aides do no heavy lifting or other types of physical activity, and WSI misinterpreted and misapplied Spectrum's job description and disregarded the evidence submitted by Spectrum as to the actual duties and risks for resident service aides. Spectrum argues WSI refused to consider and compare the rates and risks of other classifications as an indication of the rate and risk that exists for resident service aides. Spectrum claims its resident service aides should have been classified as "9090 Athletic Club" with a rate of 1.48 for purposes of establishing Spectrum's insurance premiums, or WSI should have adopted a new rate classification for Spectrum's employees.

[¶ 9] WSI's July 2002 Classification Manual includes 141 employment classifications and explains that those classifications and rates were established with the assistance of an actuarial consultant. As

relevant to this proceeding, WSI's Classification Manual describes "9002 Domestics" as:

- Employees engaged in household or domestic work performed principally inside the insured's residence. This would include a cook, housekeeper, laundry worker, maid, butler, companion, or baby sitter. The classification contemplates employees who may perform various services for the private residents. Principal duties pertain to the general operations of the household.

- Also contemplated by this classification are those individuals performing home help services or providing personal assistance or home care for persons who are convalescent, aged, acutely or chronically ill, or disabled.

—Home services providing principally nursing care by licensed nurses rated separately under 9040.

—Does not include farm activities.

—Lawn and garden service employees rated separately under 9007.

—Commercial janitorial services, cleaning services, or contractors providing workers who specialize in cleaning operations only rated separately under 9007.

—Group homes for the developmentally disabled rated separately.

[¶ 10] Spectrum's written job description for its resident service aides provides, in part:

Job Summary:

Will complete job duties as assigned by Resident Services Coordinator. Will work closely with RN on staff to ensure medications are distributed to residents who wish, per physician's orders. Responsible for knowledge of proper procedures to provide personal care services to residents. Will provide requested personal care services to residents. Responsible for the daily cleaning of the common areas of the facility. Responsible for entering notes in daily log. Will complete, as assigned daily, weekly, and monthly reports. Will notify Resident Services Coordinator when additional service needs have been identified for residents. Will coordinate with other agencies coming in to assist residents. Will assist in dining room during meal times as server. Will record residents not eating in missed meal log for both lunch and dinner. Will perform laundry duties for residents.

Primary Duties and Responsibilities:

- Provide personal care services to residents.

- Work closely with RN on staff to ensure medications are distributed per physician's orders.

- Cooperate with other agencies coming in to assist residents.

- Enter notes in daily log.

- Daily cleaning of common areas in facility.

- Provide input on resident needs for additional services.

- Assist in dining room during meal times.

- Document resident missed meals.

- Maintain daily, weekly, and monthly reports.

- Provide laundry service for residents.

[¶ 11] According to Kathy Klein, the director of Somerset Court, a resident service aide's "day is spent catering to the needs and wishes of our residents," and an aide's primary daily duties include "laundry, encouraging activity and participation, assist in the dining room, and then some cleaning around the facility." Klein testified resident service aides also provide res-

idents some bathing assistance. Tammy Kloehn, a resident service aide at Somerset Court, testified about the amount of time she spends on the various duties and responsibilities identified in Spectrum's job description for resident service aides. Kloehn testified she spends twenty percent of her time providing personal care service for residents, which includes wellness checks, handing out medication, making appointments, and providing bathing assistance; three percent working with RNs regarding medications; one percent cooperating with other agencies regarding residents; ten percent entering notes in a daily log; fifteen percent cleaning common areas of the facility; one per cent providing input on resident needs for additional services; twenty-five percent assisting in the dining room, which includes offering beverages, taking and filling food orders, and picking up dishes; five percent maintaining daily, weekly, and monthly reports; and twenty percent providing laundry service for residents.

[¶ 12] WSI adopted the administrative law judge's findings, which recognized that none of WSI's rate classifications perfectly fit Spectrum's resident service aides, but concluded "9002 Domestics" was the closest and was a reasonable and logical fit:

24. Specifically, the RSAs work includes such duties as assisting residents with dressing if needed; assisting residents with bathing if needed (washing the back, assisting to lift them, with the help of another RSA, if the resident falls and is not hurt); encouraging residents to participate in activities; handing out medications and giving shots to residents (those that are certified medication aides); responding to resident requests; vacuuming, washing windows, picking up, and other cleaning in the common areas; taking orders, serving food (bring residents their plates), filling juice cups, and pouring coffee in the dining area; carrying resident laundry to the laundry room and washing and drying the laundry; answering telephone calls; giving tours; assisting residents in cooperating with other agencies; providing input to other staff on resident needs; documenting information for residents; and making reports. RSAs do not empty bedpans, transfer residents, or do regular lifting or pulling.

. . . .

27. The evidence shows that RSAs spend 75% of their time on domestic type duties, specifically on cleaning the commons areas, providing personal care services to residents, assisting residents in the dining room, and doing laundry for residents. Although this work may rarely be heavy labor, it does involve some lifting of residents at times and certainly falls within the work of a domestic and within the description of a Domestic as found in the Bureau's July 2002 Classification Manual. . . . The remainder of the RSAs' time (25%) is spent on less strenuous and, likely, less risky activity such as entering notes in logs, filing reports, providing input to other staff on resident needs, distributing medications, and cooperating with other agencies regarding residents, as well as some time on two new duties, conducting tours on the weekend for prospective residents and their families and answering the telephone for calls to the facility (not calls to individual residents). The evidence is clear that RSAs function some as nurse aides, activity aides, domestics and clerical, but their chief duties are overwhelmingly as Domestics. Again, about 75% of an RSA's time is spent in domestic duties.

[¶ 13] WSI's Classification Manual defines "9002 Domestics" to include "cook,

housekeeper, laundry worker, maid, butler, companion, or babysitter," and "performing home help services or providing personal assistance or home care for persons who are ... aged." We have reviewed the evidence presented at the administrative hearing, and we conclude a reasoning mind could reasonably conclude, as WSI did, that resident service aides spend about seventy-five percent of their time on domestic type duties, including cleaning common areas, providing personal care services to residents, assisting residents in the dining room, and doing laundry for residents. Although this work may not necessarily involve heavy labor, those duties fit within the description of "9002 Domestics" in WSI's Classification Manual, and we decline to accept any implication in Spectrum's argument that there must be a perfect fit between the duties of a resident service aide and the description of "9002 Domestics." We conclude WSI's findings are supported by a preponderance of the evidence, and WSI's findings support its conclusions of law and decision.

[¶ 14] We reject Spectrum's claim that WSI failed to fulfill its statutory obligations by not creating a new rate classification for Spectrum's facility, or for resident service aides. WSI has a procedure in place for making classifications of employments. *See* N.D.C.C. § 65–04–01. Contrary to Spectrum's claims, that statute does not require WSI to adjudicate individual contested claims at the lowest possible scheduled rate. Rather, the statute applies the mix of issues and considerations involved with the actuarial process of establishing classifications and rates at the lowest rate which will enable WSI to comply with other provisions of that section, such as the payment of WSI's administration expenses, the payment of benefits, and the maintenance of adequate reserves and surplus to keep WSI solvent. *See* N.D.C.C. § 65–04–01(1)(a), (b), and (c). Any claim for the creation of new classifications or rates must be made in the context of the actuarial process, which is outside the scope of this proceeding.

V

[¶ 15] Spectrum raises numerous procedural and substantive errors that it claims occurred at the administrative hearing and argues WSI refused to consider Spectrum's claim that WSI acted vindictively and maliciously in establishing Spectrum's insurance premiums. We have reviewed these claims, and we find they are completely without merit.

VI

[¶ 16] We affirm the district court judgment.

[¶ 17] EVERETT NELS OLSON, S.J., CAROL RONNING KAPSNER, MARY MUEHLEN MARING, and WILLIAM A. NEUMANN, JJ., concur.

[¶ 18] The Honorable EVERETT NELS OLSON, Surrogate Judge, sitting in place of SANDSTROM, J., disqualified.